**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| TARIQ MAQBOOL, | : | Civil Action No. 14-4066 (JMV) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| GARY M. LANIGAN, *et al.*, | : | |
| | : | |
| Respondents. | : | |
| | : | |

**Vazquez, United States District Judge**

### I.       INTRODUCTION

Petitioner Tariq Maqbool ("Petitioner"), a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has filed a *pro se* Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF Nos. 6-6, 6-7, 7, 9.)  For the reasons explained in this Opinion, the Court will deny the Petition and will also deny a certificate of appealability.

### II.      FACTUAL BACKGROUND & PROCEDURAL HISTORY

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal.[1]

> Joong ["John"] Ahn owned a cell phone business in Philadelphia with his wife, where they also sold prepaid calling cards. Their nephew, Muni Ahn, also worked with them in the business. Defendant, as well as co-defendants Paul Reid and Zaid Tariq, managed separate cell phone businesses and engaged in the sale of prepaid calling cards.  Through the assistance of Jawad Mir and Amit Vishal, defendant arranged for the discounted sale of a significant quantity of prepaid calling cards to Joong and Muni Ahn.

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

On October 31, 2002, Joong, Muni, Mir, and Vishal proceeded to co-defendant Paul Reid's store in Sayreville, where defendant and the three co-defendants held the four hostage at gunpoint. As the four laid on their stomachs, defendant and the three co-defendants kicked and punched them. After seizing the large amount of cash that Joong had brought to purchase the prepaid phone cards, defendant sat on Joong's back and placed a shopping bag around his face for about a minute. When Joong struggled, defendant took a wire from an advertising board and strangled him with it until "he just stopped moving."

Defendant then took Mir and Vishal at gunpoint to the front of the store and told them that they had to shoot Muni if they wanted to live. After they refused, Mir and Vishal were dragged into the backseat of a car and driven around by co-defendant Zaid Tariq, accompanied by one of the Reids in the front passenger seat. After having been driven around for approximately fifteen minutes, they stopped and switched cars, placing Mir and Vishal into a white SUV. From there, they were driven around again until they stopped near what Mir believed to be a police precinct because he saw police cars parked nearby. While stopped, the other Reid brother "came running from the back" and sat in the rear of the SUV. Defendant entered the rear of the SUV across from Reid, took a gun from the Reid brother in the backseat, and handed it to Mir and Vishal, telling them to hold it tight so that their fingerprints remained on the gun. Defendant then threatened Mir saying, "I know your family back home. So if you open your mouth, I'll kill them." Mir and Vishal were then taken to a motel where they were given $10,000 each to remain silent. At the motel, defendant stated: "He burned the car and the bodies in them."

In the interim, about 1:30 a.m. on November 1, 2002, police and fire departments responded to a car fire in the parking lot of the Laidlaw Bus Company in Jersey City, across the street from the Hudson County Sheriff's Department and a substation of the Hudson County's Prosecutor's Office. The bodies of Joong and Muni were found in the burned SUV, later identified as Joong's vehicle. Joong had been hogtied and burned beyond recognition; he had to be identified through dental records. Muni had had his arms tied behind his back and had been shot. Dr. John Krolikowski performed the autopsy on Joong. During the autopsy, no soot was discovered in Joong's airway, indicating that he was not breathing during the fire. Dr. Krolikowski opined that the cause of death was asphyxia. Medical examiner Lyla Perez performed the autopsy on Muni. Muni had duct tape around his hands and wires around his right ankle. The top of his skull was fractured in many places, and his

2

brain was exposed. There was heat damage to his brain and to the
bones of the skull, and traces of blood in the brain. The blood in the
brain was in part due to bullet wounds inflicted prior to death. Soot
and mucus was discovered in Muni's lungs, which together with the
fact that his lungs were hyperinflated, indicated that he was alive
during the fire. Perez opined that the cause of Muni's death was
blunt trauma to the head and brain, and smoke inhalation.

*State v. Maqbool*, Indictment No. 03-03-0430, 2007 WL 1661133 at \*1-2 (N.J. Super. Ct. App.

Div. June 11, 2007).

On November 3, 2002, defendant and Tariq were apprehended
outside a store in Sayreville. *State v. Maqbool*, 2007 WL 1661133
at \* 9. (N.J. Super Ct. App. Div. June 11, 2007). Detective
Lieutenant Russo read defendant his *Miranda* rights at the scene
and again at headquarters, where defendant agreed to give a
statement.

When asked how he had spent his Halloween, defendant told
Detective Russo he had worked in his store, his girlfriend Maribel
Aquino had arrived at the store at approximately 8:00 p.m., and
Vishal and Mir had visited him at some time prior to 9:30 p.m.
when he closed the store. *Id.* at 10-11. Defendant stated he took
his girlfriend to get something to eat and they went to the Gallery
Motel where they spent the night. *Ibid.*

Detective Russo told defendant he was not telling the truth. *Ibid.*
After a break, defendant gave a second statement, which he
claimed was "the truth," that placed him at the scene of the crimes.
*Ibid.* When Detective Sergeant Theodore Wagener brought in the
bag of money that he had recovered from Maribel's residence,
defendant said it was his, that he was not talking anymore, and
that he wanted a lawyer. *Ibid.* The interview ended at that time.
*Ibid.*

*State v. Maqbool*, Indictment No. 03-03-0430, 2013 WL 57683 (N.J. Super. Ct. App. Div. Jan. 7,

2013).

Petitioner and co-defendants, Paul Reid, Steven Reid, and Zaid Tariq, were charged in a

fourteen-count indictment with first-degree murder of Joong Ahn, N.J. Stat. Ann. § 2C:11–3a(1)

or (2); first-degree felony murder of Joong Ahn, N.J. Stat. Ann. § 2C:11–3a(3); first-degree murder

of Muni Ahn, N.J. Stat. Ann. § 2C:11–3a(1) or (2) ; first-degree felony murder of Muni Ahn, N.J. Stat. Ann. § 2C:11–3a(3); first-degree armed robbery against Joong Ahn and Muni Ahn, N.J. Stat. Ann. § 2C:15–1; two counts of first-degree kidnapping of Joong Ahn and Muni Ahn, N.J. Stat. Ann. § 2C:13–1b; two counts of second-degree kidnapping of Jawad Mir and Amit Vishal, N.J. Stat. Ann. § 2C:13–1b; fourth-degree aggravated assault by pointing a firearm against Joong Ahn, Muni Ahn, Jawad Mir, and Amit Vishal, N.J. Stat. Ann. § 2C:12–1b(4); third-degree possession of a weapon (handgun) without a permit, N.J. Stat. Ann. § 2C:58–4 and N.J. Stat. Ann. § 2C:39–5b; second-degree possession of a weapon (handgun) for an unlawful purpose, N.J. Stat. Ann. § 2C:39–4a; and second-degree conspiracy to commit armed robbery, N.J. Stat. Ann. § 2C:5–2 and N.J. Stat. Ann. § 2C:15–1.  The Grand Jury also returned a Notice of Aggravating Factors as to the first-degree murder counts`, subjecting defendant to the death penalty, pursuant to N.J. Stat. Ann. § 2C:11–3.

Following a separate jury trial, Petitioner was convicted on all counts, except Counts Nine, Ten, and Eleven.  During the penalty phase of the trial, the jury declined to find any aggravating factors, and the death penalty was not imposed.  Petitioner was sentenced on Count One to life imprisonment; on Count Four to a consecutive life term; on Count Seven to a concurrent term of thirty years; and on Count Twelve to a concurrent term of five years.  The remaining convictions were merged.  All sentences, other than Count Twelve, were made subject to the No Early Release Act (NERA), N.J. Stat. Ann. § 2C:43–7.2.

The Appellate Division affirmed Petitioner's conviction.  *Maqbool*, 2007 WL 1661133 at *16.  The Supreme Court denied certification on September 7, 2007.  *State v. Maqbool*, 192 N.J. 478 (2007).

4

On December 20, 2007, defendant filed a petition for post-conviction relief ("PCR"), but he subsequently withdrew it. He refiled his petition on October 26, 2009. On November 4, 2010, Judge Paul M. De Pascale, who had also presided over the trial, held oral argument, determined an evidentiary hearing was not required, and denied defendant's petition for PCR. (ECF No. 19-90). On January 7, 2013, the Appellate Division affirmed the PCR Court's decision. *State v. Maqbool*, Indictment No. 03-03-0430, 2013 WL 57683 (N.J. Super. Ct. App. Div. Jan. 7, 2013).

On June 28, 2013, the New Jersey Supreme Court denied Petitioner's petition for certification. *State v. Maqbool*, 24 N.J. 118 (2013). Petitioner filed the instant petition for habeas relief under § 2254 on September 12, 2014. (ECF No. 7.) This Court issued an opinion and order denying the following claims in his Petition for Writ of Habeas Corpus:

1. Trial court erroneously admitted Petitioner's custodial statements.

2. Trial court's jury instructions were erroneous.

3. Ineffective assistance of trial counsel for failing to obtain Petitioner's cellular phone record in support of an alibi.

4. Ineffective assistance of trial counsel for failing to obtain exculpatory recording from Petitioner's phone and for failing to introduce Petitioner's personal and business telephone records.

5. Ineffective assistance of trial counsel for failing to object to the admission of any of Petitioner's custodial statements.

6. Ineffective assistance of trial counsel for failing to object to the prosecution's suborning perjury.

7. Ineffective assistance of trial counsel for failing to investigate and present additional defense witnesses.

8. Ineffective assistance of trial counsel for failing to object to the trial court's accomplice liability instruction and failing to object to the court's response to a jury question.

9. Ineffective assistance of trial counsel for failing to object to admission of inadmissible hearsay.

10. Ineffective assistance of appellate counsel for failing to raise the trial court's admission of inadmissible hearsay on direct appeal.

11. Trial/PCR judge's bias against Petitioner.

(ECF Nos. 27-28.)

Petitioner subsequently filed a motion for reconsideration, where he argued in part that several of his claims asserted in "Addendum C" of his habeas petition were not addressed in the Court's May 11, 2018, opinion and order. (ECF No. 29.) This Court granted Petitioner's motion and ordered Respondents to answer Petitioner's additional claims. (ECF No. 42.) Respondents filed their Answer on December 31, 2018. (ECF No. 48.) Petitioner filed a traverse on February 26, 2019. (ECF No. 51.) The matter is fully briefed and ready for disposition.[2]

## III.   STANDARD OF REVIEW

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts. *See Renico v. Lett,* 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

---

[2] The Court vacates its prior Opinion and Order dated, May 11, 2018, and addresses the claims previously decided in that Opinion, here.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits, a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)). Moreover, AEDPA deference applies even when there has been a summary denial. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) (citation omitted).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions," as of the time of the relevant state-court decision. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000))). If a decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen*, 563 U.S. at 180-81.

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of AEDPA necessarily apply. First, AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). Second, AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State." 28 U.S.C. 2254(b)(1)(A). To do so, a petitioner must "fairly present all federal claims to the highest state court before bringing them in a federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d. Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d. Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365-66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing

8

of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## IV.    ANALYSIS

The instant Petition raises numerous grounds for relief, the majority of which are ineffective assistance of trial and/or appellate counsel.  In his traverse, Petitioner relying on Third Circuit and California state court precedent, argues that Respondent's failure to answer each of Petitioner's claims in their answer constitutes an admission.  (ECF No. 51 at 14.)[3]  For the reasons explained below, the Court finds that Petitioner's claims do not warrant federal habeas relief.

### A.    Trial Court Errors

#### 1.    Trial Court's Erroneous Admission of Custodial Statements.

---

[3] The Court notes that Petitioner raised new claims in his traverse.  For example, his claim of ineffective assistance of counsel due to counsel's failure to object to the prosecutor's statements about Angela Williams was not previously raised before this Court. (ECF No. 51 at 17.)  A "moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *D'Allessandro v. Bugler Tobacco Co.*, Civil Action No. 05–5051, 2007 WL 130798, at *2 (D.N.J. Jan. 12, 2007) (quoting *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir.1992)).  Therefore, this Court will not address the merits of this claim.

Petitioner asserts that the trial court's admission of his custodial statements as well as any other evidence, were in violation of his Fourth Amendment right to be free from unreasonable search and seizure.  (ECF No. 9-1 at 11-20.)  Petitioner argues that the trial court's admission of his custodial statements were in violation of his Fifth, Sixth, and Fourteenth Amendment rights because he was not made aware that there was a criminal complaint against him.  (ECF Nos. 6-6 at 41, 6-7 at 1-2.)  Finally, Petitioner argues that the trial court erroneously admitted Petitioner's uncounseled custodial statements.  (ECF No. 6-6 at 28-31.)  Petitioner asserts that in light of his illegal arrest, any statements made to law enforcement should have been suppressed.  Because the underlying facts of the aforementioned claims arise from the same set of facts, the Court analyzes them together.

Petitioner initially raised the claim that his statement was admitted despite his being arrested without a valid warrant in his *pro se* supplemental brief on direct appeal.  *See Maqbool*, 2007 WL 1661133 at *3.  The Appellate Division summarily denied the valid warrant issue.  *Id.* at 15.   However, the Appellate Division did expressly address Petitioner's counseled Fifth Amendment claim that his statements were improperly admitted despite the state's failure to apprise him of the criminal complaint against him.  *Id.* at *3-8.  In light of this, this Court considers the trial court error claims with respect to his arrest without a valid warrant and because of his unawareness of a criminal complaint, exhausted.

The Petitioner subsequently only raised these claims within the context of ineffective assistance claims in his *pro se* supplemental brief appealing the denied PCR petition.  *See Maqbool*, 2013 WL 57683 at *8.  The Appellate Division affirmed the PCR Court's denial and deemed all of the issues raised in his *pro se* supplemental filing unmeritorious.  *Id.* at *1.

Petitioner argues that at the time of his arrest outside of a convenience store in Sayreville, New Jersey, an arrest warrant had not been issued for his arrest and there was no probable cause for his arrest.[4]  (ECF 9-1 at 12, 6-7 at 20-22.)  Moreover, Petitioner contends that his arrest and subsequent interrogation was an unconstitutional investigatory tactic to obtain information about the murders.  (*Id.* at 12-13.)  Petitioner further claims that appellate counsel failed to raise this claim on appeal.  (ECF No. 6-7 at 25.)

Petitioner's trial counsel filed a pre-trial suppression motion pursuant to Petitioner's Fifth Amendment right to remain silent.  At the hearing, Lieutenant Russo of the Hudson County Prosecutor's Office testified about his role at that stage of the investigation, which included supervising the multi-jurisdictional arrest effort as well as conducting Petitioner's subsequent interrogation.  Petitioner, who also testified at that hearing, gave an almost entirely different account of the facts surrounding his arrest and subsequent interrogation.  Petitioner argues that Lieutenant Russo's testimony should not be believed over his.  (ECF No. 6-7 at 1-2.)  The crux of Petitioner's trial counsel's line of questioning at the hearing revolved around Petitioner's understanding of his *Miranda* rights.  The issue of the legality of the arrest or the existence of a warrant or criminal complaint was not raised by any of the parties.  (ECF Nos. 19-51 at 41-111, 19-52 at 3-40.)

The Appellate Division rejected this claim, providing in part as follows:

> Leaving aside defendant's alleged request for counsel, the events as described by defendant contradict his assertion that he did not understand that a "veil of suspicion" had been cast over him.  He was surrounded by police, handcuffed and taken to the homicide unit of the prosecutor's office.  He admitted that he did not feel free to leave.  This is different from the situation in *A.G.D.*, where

---

[4] Members of the Hudson County Prosecutor's Office drafted a warrant dated November 1, 2002, that was not executed until November 4, 2002, one day after Petitioner's arrest.  (ECF No. 9-3 at 51.)

> detectives had gone to the defendant's house to talk to defendant; a detective had specifically informed the defendant that he was not under arrest; and the defendant voluntarily accompanied the detectives to be questioned. *A.G.D.*, *supra*, 178 N.J. at 59, 835 A.2d 291. Here, any reasonable person in defendant's position would understand that he or she was under arrest.
>
> Further, defendant acknowledged that before giving the second statement, the officers had told him that they knew he was involved in a crime and "knew that he killed the first man." Defendant claims that he said "if you have me here for murder, I would definitely like a lawyer present." If stated, defendant's own words belie his claim that he did not understand that charges against him, and indicate, moreover, that he understood his rights. His claim that Russo then told him he "might not be a target" is not credible. Even if Russo did make that statement, a reasonable person would understand that when you are handcuffed to a chair and officers have just informed you that they know you killed a man, you are at least a target.
>
> Unlike *A.G.D.*, no arrest warrant had been issued for defendant; it was issued the next day. The complaint was signed sometime on November 3, but there was no indication whether it had been signed before or after defendant's arrest. Even if it had been signed before the arrest, there is a major distinction between this case and *A.G.D.* because defendant in *A.G.D.* was not arrested until after his statement, even though a warrant for his arrest existed. This "lack of critically important information" deprived the defendant of "information indispensable" to a knowing and intelligent waiver of rights. *A.G.D.*, *supra*, 178 N.J. at 69, 835 A.2d 291. "[W]ithout advising the suspect of his true status when he does not otherwise know it," the State could not show that the suspect had made an informed waiver of his rights. *Ibid.* Here, in contrast, defendant understood his status as having been arrested for murder. Accordingly, we agree with the trial judge that *A.G.D.* is distinguishable and is not a basis to suppress defendant's custodial statements.

See *Maqbool*, 2007 WL 1661133 at *8.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Any evidence or statements stemming from an unlawful, warrantless arrest are usually "suppressible if the link between the evidence and the unlawful conduct is not too attenuated."

*I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1040-41 (1984) (citation omitted). Nonetheless, warrantless public arrests based on probable cause are legal. *United States v. Watson*, 423 U.S. 411, 423 (1976). "Probable cause exists whenever reasonably trustworthy information or circumstances within an arresting officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested." *United States v. Laville*, 480 F.3d 187, 194 (3d Cir. 2007) (citations omitted).

The record reflects that at the time of Petitioner's arrest on November 3, 2002, law enforcement had significant information establishing Petitioner's role in the robbery and murders, including the statements provided by eyewitness, Jawad "Jay" Mir, on November 2, 2002, as well several thousand dollars in United States currency that Petitioner gave to Mir and Amit "Andy" Vishal immediately after the murders. (ECF Nos. 19-63 at 7-9, 19-67 at 24-25.) In fact, Mir was brought to the arrest location by one of the law enforcement agencies in order to immediately identify Petitioner upon his apprehension. (ECF No. 19-61 at 22.) In light of the foregoing, probable cause existed that Petitioner had committed murder and robbery and his arrest did not contravene the Fourth and Fourteenth Amendments. Consequently, Petitioner's argument that his custodial statements should be suppressed as the fruit of an illegal arrest, fails. The state court's decision was not an unreasonable application of clearly established federal law. Moreover, to the extent that Petitioner now raises an ineffective assistance of appellate counsel claim, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl v. Vaughn*, 166 F.3d 163, 174 (3d Cir. 1999). Accordingly, this ground for a writ of habeas corpus will be denied.

Petitioner also argues that the trial court's refusal to suppress his custodial statements was in violation of his right against self-incrimination and his right to counsel. (ECF No. 6-6 at 25-

31.)  Petitioner maintains that his testimony at the suppression hearing undermined that of Lieutenant Russo's and should have resulted in the trial court suppressing his custodial statements. (*Id.* at 29-30.)

> The Appellate Division also rejected this claim, providing in part as follows:

>> We are satisfied that none of these alleged discrepancies cast significant doubt on Russo's credibility.  The judge found that Russo was credible, citing to his "forthright, relaxed and candid" demeanor, and the fact that his testimony was "clear, unequivocal and consistent with both his formal reports and his preserved handwritten notes."  The judge was particularly impressed that Russo kept his notes, as that was not the typical practice among detectives.

>> The record supports the judge's findings.  Although the judge did not comment on defendant's lack of credibility, it seems incongruous for defendant to assert that he repeatedly asked for a lawyer, did not receive one, yet gave the detailed statements anyway.  By all accounts, defendant is an intelligent, fairly educated man.  Additionally, it is difficult to believe defendant's claim that he made no statements at all, other than to give his biographical data and to say whether he knew certain people, given Russo's detailed notes.  Russo could not have invented the details of those statements, some of which paralleled other witnesses' statements.  Accordingly, the judge, having had sufficient reasons to believe Russo over defendant, did not err in refusing to suppress the custodial statements.

*See Maqbool*, 2007 WL 1661133 at *11.

Under *Miranda v. Arizona*, 346 U.S. 436 (1966), and its progeny, a statement taken during a custodial interrogation is only admissible at a criminal defendant's trial where that defendant was advised of his rights and has made a knowing, intelligent, and voluntary waiver of his rights. 346 U.S. at 444; *see also Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010); *Sweet v. Tennis*, 386 F. App'x 342, 345 (3d Cir. 2010).  "The waiver inquiry has two distinct dimensions: waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right

14

being abandoned and the consequences of the decision to abandon it." *Berghuis*, 560 U.S. at 382-83 (internal quotations omitted). Waiver need not be express, but may be made by implication so long as the facts establish that the defendant was informed of his right[] to counsel and [right to] remain silent, understood those rights, and then voluntarily made a statement. *Id.* at 383.

In considering a *Miranda* suppression decision during habeas review, federal courts have "an 'independent obligation' to determine whether a confession was voluntary." *Sweet*, 386 F. App'x at 345 (quoting *Miller v. Fenton*, 474 U.S. 104, 112 (1985)). In undertaking that independent obligation, the federal court is not bound by the state courts' ultimate decision as to the voluntariness of a waiver of the petitioner's rights, but must defer to state court fact finding as to "subsidiary factual questions" including findings regarding the credibility of the witnesses who testified at the suppression hearing. *Id.*; *see also Miller*, 474 U.S. at 110-12. Ultimately, if the court concludes that the state court was correct in determining that, under the totality of the circumstances, "the confession was obtained in a manner compatible with the requirements of the Constitution," no habeas relief is warranted. *Sweet*, 386 F. App'x at 345; *Miller*, 474 U.S. at 112.

Before denying Petitioner's motion to suppress, the trial court made, *inter alia*, the following fact findings:

> In this case, there was no absolutely no doubt that Mr. Maqbool understood the police intended to arrest him in connection with a double homicide.
>
> He was surprised by officers from multiple jurisdictions on a public street, physically restrained, placed up against his car, searched and handcuffed.
>
> He was then advised of his rights and that he was being taken from that jurisdiction to Jersey City in connection with a double murder investigation. No questioning was undertaken until the Defendant was secured in an interview room in a police interrogation room and only after formal *Miranda* procedures were undertaken and completed.

15

There's no question in this matter that a reasonable man in Mr. Maqbool's position would quite clearly understand that he was the focus of a murder investigation.

In *A.G.D.* the officers through their actions and inaction led the Defendant to believe that he had a choice as to whether he would accompany them, leaving open to speculation in the Defendant's mind what his status was.

Here, it was absolutely no doubt in the Defendant's mind that he had no such choice, and that he had been arrested in connection with a double homicide.

It is therefore clear that Defendant was fully cognizant of his status as a suspect or target at the time of his arrest and prior to his making any statement to the police and being advised of his Rights.

Not only was he aware of his status, the facts here demonstrate he had a full and complete understanding of his rights prior to speaking with the police. After having been advised orally of his rights at the scene of his arrest, he remained silent on the trip to Jersey City.

Upon his arrival, he was read his rights formally by Lieutenant Russo. He was then asked if he had understood what had been read to him. Before acknowledging his understanding, the Defendant asked if he could read the document himself. He was provided with the document, read it and then indicated his understanding of its content.

His understanding of his rights and of his continuing options with regard to the exercise of those Rights was demonstrated later in the interrogation when after it became apparent that the police knew or suspected he was lying, he asserted his right to counsel and thereby stopped the interrogation. This fact also demonstrates that prior to the exercise of his rights, the Defendant had voluntarily agreed to waive them and to speak with the police.

For all of those reasons, I am satisfied the State has demonstrated beyond a reasonable doubt that the Defendant was advised of his rights. That he had knowledge of those rights. That he understood them fully and completely, and with that full and complete knowledge of understanding, voluntarily waived them.

(ECF No. 19-52 at 74-77.)

16

Petitioner asserts that he "testified clearly and consistently both that he was questioned after he had invoked his right to counsel and that *Miranda* rights were never effectively administered to him." (ECF No. 6-6 at 29.) He further argues that "the record reflects that the court's wholesale acceptance of Russo's account was indeed 'so far from the mark' as to warrant rejection of its findings." (*Id.* at 30.)

The record does not support Petitioner's argument. Moreover, the Court defers to the trial court judge's credibility finding in favor of Lieutenant Russo (ECF No. 19-52 at 72), which this Court does not find to be in error  Therefore, the state court did not unreasonably apply federal law. Accordingly, this claim will be denied.

2. Trial Court Erroneously Permitted Only a Partial Readback of a Witness's Testimony.

Petitioner next argues that the trial court erroneously permitted only a partial readback of state witness, Rajesh "Nick" Goel's testimony. (ECF No. 6-7 at 13-15.) Petitioner also unsuccessfully raised this claim on direct appeal. *See Maqbool*, 2007 WL 1661133 at *3.

Goel, who was also in the telephone card business, helped facilitate the business deal between Petitioner and decedent, John Ahn. (ECF No. 19-64 at 43-50.) He testified that on October 29, 2002, he met with Ahn and others involved in the business transaction in New York and they subsequently all travelled to Petitioner's location in New Jersey. Goel also testified that he had a brief exchange with Petitioner that day and Petitioner expressed that the amount of money that Goel brought was far less than what the transaction entailed. (ECF No. 19-64 at 8-9.) The two exchanged phone numbers and they did not see each other after that meeting, two days before the double murders. (*Id.* at 10, 15.) Goel, who did not provide any previous identification to law enforcement, also testified that he had met Petitioner one time before at a White Castle restaurant.

17

(*Id.* at 16.)  On cross-examination, Petitioner's counsel attempted to impeach Goel's recollection of whether he ever actually met Petitioner.  (*Id.* at 27-33.)

During deliberations, the jury requested a readback of Goel's testimony.  (ECF No. 19-77 at 7.)  As Petitioner concedes, the trial court asked the court reporter to read Goel's testimony in its entirety unless the jury was satisfied with a portion of the readback.  (*Id.* at 8.)  The record reflects that the jury foreperson interrupted the court reporter after a portion of Goel's testimony was read and indicated that no further readback was necessary.  (*Id.*)

> (The reporter reads back the testimony of Rajesh "Nick" Goel from the proceedings of April 6, 2005, beginning at 12:30 p.m.)
>
> (The foreperson interrupts the reading from the afternoon session at page 16, line 6.)
>
> THE FOREPERSON:  Excuse me.
> THE COURT:  That's all you need?
> THE FOREPERSON:  Yes.
> THE COURT:   You don't need to go through the rest of the testimony?
> THE FOREPERSON:  No, we just needed something cleared up, and that's it.

(*Id.*)

Nonetheless, Petitioner argues that he was prejudiced because the trial court prompted the court reporter to stop reading Goel's testimony.  (ECF No. 51 at 57.)  Petitioner's assertion is belied by the record.  The jury foreperson asked the court reporter to stop the readback, not the trial judge.  The trial judge merely informed the jury that they may only listen to a portion of the readback should they desire.

"A readback of portions of the trial record is a matter committed to the sound exercise of a trial court's discretion."  *United States v. Young*, 140 F.3d 453, 456 (2d Cir. 1998).  Here, Petitioner has not established that his right to a fair trial was violated as a result of the trial judge's actions. *See Deoleo v. Miller*, 2003 WL 23199522, *6 (E.D.N.Y. Dec. 2, 2003) (held that trial court's

decision to stop readback after receiving an indication from the jury that it was satisfied with the readback, was not abuse of discretion). Petitioner has not articulated, nor can the Court perceive any actual prejudice from the judge allowing the jury to curtail the readback to only the portion which they desired. The jury had already heard Goel's testimony in its entirety, such that the readback did not provide anything new. Consequently, the state court's denial of this claim does not constitute an unreasonable application of federal law.

      3.  Trial Court Erroneously Admitted State Medical Expert's Testimony.

      Petitioner next submits that the trial court erroneously permitted state medical examiner, Dr. John Krolikowski, to testify at his trial despite evidence of his being restricted from practicing medicine in another jurisdiction. (ECF No. 6-7 at 17-19.) Petitioner unsuccessfully raised this claim on direct appeal. *See Maqbool*, 2007 WL 1661133 at *11-13. The Appellate Division denied this claim providing as follows:

> Defendant contends that Krolikowski was "so thoroughly discredited" during voir dire that the judge should not have allowed him to testify. Specifically, he points to the suspension of Krolikowski's Massachusetts license and his "lack of candor" on the issue. Lack of candor was an issue for the jury to determine. The judge's role was to determine whether Krolikowski possessed the minimum qualifications to testify, and given his education, New Jersey licensure and employment, he clearly was. Defendant was free to argue the weight of Krolikowski's expertise to the jury, but there was no basis for rejecting his qualification as an expert. Thus, there was no error, much less plain error.

*See id.* at *13.

      Petitioner argues "that the professional sanctions upon Dr. Krolikowski demonstrates that he lacked sufficient expertise to offer the intended testimony." (ECF No. 6-7 at 18.)[5] Petitioner

---

[5] Petitioner also argues that Dr. Krolikowski previously testified in a manner that resulted in a wrongful conviction. (ECF No. 6-7 at 18.) The record does not support Petitioner's assertion. The record reflects that the restriction in Massachusetts was the result of his handling of three

urges that because the victims' cause of death was a contested fact at trial, Dr. Krolikowski's testimony for the state played a significant role in his ultimate conviction. The state court's decision that while Dr. Krolikowski's credibility was an issue for the jury, his ability to testify as an expert was appropriately decided by the trial court, is not an unreasonable application of clearly established federal law. *See United States v. Scheffer*, 523 U.S. 303, 313 (1998) (citations and internal quotation marks omitted) ("A fundamental premise of our criminal trial system is that the jury is the lie detector."). Accordingly, this ground for a writ of habeas corpus will be denied.

Petitioner next claims that the trial court's erroneous jury instructions violated his right to a fair trial. (ECF Nos. 9-1 at 5-11, 6-7 at 3-11.) The jury instruction claims are as follows: the trial court erroneously repeated prejudicial hearsay statements; the trial court erroneously shifted the burden of proof of disproving Petitioner's role in the murders; the trial court provided misleading instructions on Petitioner's use of a firearm; the trial court provided misleading instructions on the law of circumstantial evidence; the trial court failed to provide instructions that if the jury disagreed on Petitioner's mental state it could have returned a guilty verdict for a lesser included offense of murder; and the trial court erroneously failed to instruct the jury that causation must be unanimous.

### 4. Trial Court's Repetition of Prejudicial Hearsay Statements was Erroneous.

Petitioner submits that the trial court's reference to hearsay statements made by state witnesses Jawad "Jay" Mir and Maribel Aquino, violated his Sixth and Fourteenth Amendment constitutional rights. (ECF No. 6-7 at 3-5.) Petitioner raised this claim on direct appeal. *See Maqbool*, 2007 WL 1661133 at *1-2. The Appellate Division denied this claim as meritless. *Id.* at 3.

---

prostate biopsy slides that were misread. (ECF No. 19-59 at 11-13.)

To show that a jury instruction violated due process, Petitioner must show "both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (internal citation and quotation marks omitted). The instruction "must be considered in the context of the instructions as a whole and the trial record." *Id.* at 191 (internal citation and quotation marks omitted). Moreover, "it is not enough that there is some slight possibility that the jury misapplied the instruction, the pertinent question is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (internal citation and quotation marks omitted). "In other words, the inquiry requires careful consideration of each trial's unique facts, the narratives presented by the parties, the arguments counsel delivered to the jurors before they retired to deliberate, and the charge as a whole." *Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (citing *Waddington*, 555 U.S. 179). As a court in this district has observed:

> [Q]uestions relating to jury charges are normally matters of state law and not cognizable in federal habeas review. *See Engle v. Isaac, 456 U.S. 107 (1982)*; *Henderson v. Kibbe,* 431 U.S. 145 (1977); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 309 (3d Cir.), *cert. denied,* 502 U.S. 902 (1991); *Grecco v. O'Lone,* 661 F.Supp. 408, 412 (D.N.J.1987). [T]he district court must consider " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.' "*Henderson,* 431 U.S. at 154 (quoting *Cupp v. Naughten,* 414 U.S. 141, 146–47 (1973)).

*Porter v. Brown*, No. 04-4415, 2006 WL 2640624, at *8 (D.N.J. Sept. 12, 2006).

Petitioner claims that the trial court improperly cited two of the state's witnesses' hearsay statements during the jury charge stage of the trial. (ECF No. 6-7 at 3-5.) Petitioner argues that because of the dearth of physical evidence linking him to the double murders, he was significantly

prejudiced by the state witnesses' hearsay statements.  (*Id.* at 5.)  Petitioner submits that the following alleged hearsay statements were repeated by the trial judge in its jury charge: "that the petitioner had ordered Jawad "Jay" Mir to shoot one of the victims and to place his fingerprints on a gun purportedly used in the crime; threatened Jay with death of his family if he reported the incident; orchestrated the purported cover up of the incident was in charge of the money purportedly obtained; and admitted to burning the bodies."  (*Id.* at 4.)  Further, "that the petitioner enlisted Maribel in the creation of a false alibi; effectively admitted an interest in the purported proceeds by asking if Zaid had taken them; advanced the purported scheme by saying that the $65,000 that had purportedly been offered was insufficient; and acknowledge, to the police, ownership of a bag purportedly containing proceeds."  (*Id.*)

The record reflects, and Petitioner partially concedes, that the trial court gave an instruction on witness credibility and what weight, if any, to give to a witness's testimony.  (ECF Nos. 19-75 at 12, No. 6-7 at 5.)  Moreover, the trial court instructed the jury that the reference to facts from the trial was solely for illustrative purposes.  (ECF No. 19-75 at 12.)

This Court has reviewed the portion of the jury charge pertaining to these allegedly prejudicial hearsay statements.  First, the Court notes that Petitioner mischaracterizes how the trial court reiterated some of witness Jawad Mir and witness Maribel Aquino's testimony.  The trial court did not use the following phrases which Petitioner uses in the instant petition:  "that the petitioner enlisted Maribel in the creation of a false alibi; effectively admitted an interest in the purported proceeds by asking if Zaid had taken them; advanced the purported scheme by saying that the $65,000 that had purportedly been offered was insufficient; and acknowledge, to the police, ownership of a bag purportedly containing proceeds."  (ECF No. 6-7 at 4.)  More importantly, the trial court referenced the challenged testimony because they were all statements

attributed to the Petitioner.  (ECF No. 19-75 at 21-24.)

Petitioner has not established that any of the challenged testimony from Mir or Aquino was hearsay.  These statements appear to have been introduced as statements by a party opponent, namely the Petitioner.  Such statements are not considered hearsay under Federal Rule of Evidence 801(d)(2)(A) and its New Jersey counterpart, New Jersey Rule of Evidence 803(b)(1).  Therefore, Petitioner's constitutional rights were not implicated by the trial court's reference to Petitioner's own statements.  The state court's decision was not an unreasonable application of federal law. Accordingly, this claim will be denied.

> 5.    The Other Alleged Erroneous Jury Instructions

Petitioner raises the following claims in ground five of Addendum C of his petition. Petitioner unsuccessfully raised all of the issues in his *pro se* brief on direct appeal.  *See Maqbool*, 2007 WL 1661133 at *1-2.  The Appellate Division denied this claim as meritless.  *Id.* at *3.  In Petitioner's counseled petition for certification to the New Jersey Supreme Court, counsel only relied on his appellate brief.  (ECF No. 19-8 at 4.)  Petitioner subsequently filed a *pro se* submission raising additional claims that were raised in his *pro se* brief before the Appellate Division, and asked the Court to consider his late filing.  (ECF No. 19-9 at 5-6.)  The New Jersey Supreme Court issued a one-page order denying certification less than a month after Petitioner's filing.  The record is unclear whether Petitioner's *pro se* claims were ever considered by the New Jersey Supreme Court on petition for certification.  Nonetheless, the claim fails under both AEDPA deference and the less stringent *de novo* standard.  Petitioner adds that appellate counsel failed to raise this claim on appeal.  (ECF No. 6-7 at 25.)

First, Petitioner claims that the trial court erroneously shifted the burden of proof by instructing the jury "that the petitioner must produce evidence to show that if he was present at the

scene of the crime, he did not participate in it." (ECF No. 6-7 at 7.) Petitioner adds that this

instruction impinged on his constitutional right to remain silent. (*Id.*)

While Petitioner does not cite to the exact jury instruction which he challenges, after

reviewing the trial court record, this Court presupposes that the Petitioner is referencing the

accomplice liability instruction. (ECF No. 19-75 at 66-67.) The relevant portion of the trial court's

jury instruction on accomplice liability is as follows:

> Presence is not, in itself, conclusive evidence of that fact. Whether
> presence has any probative value depends upon the total
> circumstances. To constitute guilt, there must exist a community of
> purpose, an actual participation in the crime committed. While mere
> presence at the scene of the perpetration of a crime does not render
> a person a participant in it, proof that one is present at the scene of
> the commission of the crime or crimes without disapproving or
> opposing it is evidence from which, in connection with other
> circumstances, it is possible for the jury to infer that he assented
> thereto, lent to it his countenance and approval, and was thereby
> aiding the same. It depends on the totality of the circumstances as
> those circumstances appear from the evidence.

(*Id.*)

Petitioner's claim that the jury instruction shifted the burden of proof is belied by the

record. Petitioner has not demonstrated how the trial court shifted the burden. Evidence of an

accomplice's disapproval or opposition to the commission of a crime could have come from any

of the evidence and was not a fact that had to be submitted by the defense. Moreover, even if the

defense presented a case as it did in Petitioner's trial, it was not incumbent on Petitioner to testify

in his own defense. Finally, the trial court provided a jury instruction prohibiting the jury from

considering Petitioner's exercising his right to not testify. (*Id.* at 16-17.) Moreover, the jury

instructions were also clear that the burden of proof remained at all times with prosecution.

Petitioner has not established that the instruction resulted in a reasonable likelihood that the jury

applied the instruction in a way that relieved the prosecution of its burden of proof.

Next, Petitioner claims that the trial court provided misleading instructions on Petitioner's use of a firearm. (ECF No. 6-7 at 8.) Petitioner's argument, while not the model of clarity, is as follows:

> The trial court instructed the jurors that they could infer that the petitioner's purpose was to take life or cause bodily injury resulting in death, if they found that the victim was killed with a firearm. The petitioner, in addition to murder was also charged with aggravated manslaughter and manslaughter for the first victim, John Ahn. And to aggravated assault for the second victim, Muni Ahn. The charged crimes contain a mens rea element of recklessness. Jurors, however, can just as readily infer a state of recklessness based on the manner and circumstances of the killing; consequently, the trial court irrationally and unreasonably restricted the jurors inferences to purposeful or knowing conduct based on the fact that a firearm had been used.

(*Id.*)

The record reflects that the trial court's instructions on aggravated manslaughter and manslaughter of victim, John Ahn, were consistent with the respective statutes. (ECF No. 19-75 at 41-42 and 47-49.) Despite Petitioner's assertion that the trial court's jury instruction "restricted the jurors inference to purposeful or knowing conduct based on the fact that a firearm had been used," the record reflects that the trial court provided recklessness as a necessary element of an aggravated manslaughter charge. (ECF No. 19-75 at 41-42.) Moreover, despite Petitioner's claim otherwise, the use of a firearm was not at issue with respect to John's Ahn's death as the evidence suggested that his death was caused by strangulation. *See Maqbool*, 2007 WL 1661133 at *2.

The trial court's instruction on aggravated manslaughter was also consistent with the statutory language. (ECF No. 19-76 at 58-62.) Finally, count eleven of the indictment charged Petitioner with aggravated assault in violation of N.J. Stat. Ann. § 2C:12-1b(4). *See Maqbool*, 2007 WL 1661133 at *1. The statute provides as follows: "A person is guilty of aggravated assault if he: knowingly under circumstances manifesting extreme indifference to the value of human life

points a firearm, as defined in subsection f. of N.J. Stan. Ann. 2C:39-1, at or in the direction of

another, whether or not the actor believes it to be loaded."  N.J. Stat. Ann. § 2C:12-1b(4).

Petitioner appears to be arguing that the jury could have inferred that he acted recklessly based on

the facts elicited at trial.  The trial court's jury instruction was consistent with the charges of

knowing aggravated assault and the Court finds no constitutional violation.

Petitioner next submits that the trial court's instruction on circumstantial evidence, was

highly prejudicial.  (ECF No. 6-7 at 9.)  Shortly before the attorneys' opening arguments, the trial

court provided the following instruction to the jury-

> Evidence may be either direct or circumstantial.  Direct evidence means evidence that directly proves a fact without an inference, and which in itself, if true, conclusively establishes that fact.
>
> On the other hand, circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn.  An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established  by the evidence.
>
> It's not necessary that facts be proved by direct evidence.  They may be proved by circumstantial evidence, or by a combination of direct and circumstantial evidence.  Both direct and circumstantial evidence are acceptable as means of proof.  Indeed, in many cases, circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence.  In any event, both circumstantial and direct evidence should be scrutinized and evaluated carefully.  A conviction may be based on circumstantial evidence alone, or in combination with direct evidence provided, of course, that it convinces you of the defendant's guilt beyond a reasonable doubt.
>
> Conversely, if circumstantial evidence gives rise to a reasonable doubt in your mind as to the defendant's guilt, then the defendant must be found not guilty.
>
> Let me give you a simple illustration of the difference between direct and circumstantial evidence, because sometimes the law sounds a little more complicated than it is, in simple terms.  Let's assume the proposition that you wanted to establish with direct evidence that it snowed last night.  If the testimony was that before you went to bed

last night you walked over to your bedroom window, opened the blinds, looked outside and it was snowing, then that testimony would directly establish that it snowed last night, I saw it snowing last night.  Okay?  That's direct evidence.  Directly establishes it without need for any inferences or anything else.

Let's assume you wanted to do the same thing circumstantially.  If last night you got up before you went to bed, walked over to your bedroom window, looked out the blinds, it wasn't snowing, and there's not snow on the ground, then you went to bed.  When you got up in the morning, you walked over to the window, you looked outside, it wasn't snowing out, but the ground was covered with snow.  From those facts the circumstances would lead you to the proposition that it snowed last night.  It wasn't there when you went to bed, and it was there when you got up in the morning, it snowed last night.  The circumstances that you believe are true lead you to conclude another fact is true.   That's circumstantial evidence. Everybody understand what I mean by that?

(ECF No. 19-53 at 9-11.)

Shortly before jury deliberations, the trial court added the following instruction about circumstantial evidence:

Now, evidence may be either direct or circumstantial.   Direct evidence means evidence that directly proves a fact without an inference, and which in itself, if true, conclusively establishes that fact.

On the other hand, circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn.

You all remember the example I gave you earlier before we started the testimony in the case about the snowfall, and how you would prove it.  Does everybody recall that?  All right.  So that's really, we're talking about the same thing.

An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence.  Whether or not inferences should be drawn is for you to decide, using your own common sense, knowledge, and everyday experience.  Ask yourselves is it probable, logical, and reasonable.

> Now, its not necessary that all facts be proven by direct evidence. They may be proven by direct evidence, circumstantial evidence, or by a combination of direct and circumstantial evidence. All are acceptable as means of proof. In many cases, circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence.
>
> However, direct and circumstantial evidence should be scrutinized and evaluated carefully. A verdict of guilty may be based on direct evidence alone, circumstantial evidence alone, or a combination of direct and circumstantial evidence provided, of course, that it convinces you of the defendant's guilty beyond a reasonable doubt.
>
> The reverse is also true. A defendant may be found not guilty by reason of direct evidence, circumstantial evidence, a combination of the two, or a lack of evidence, if it raises in your mind a reasonable doubt as to the defendant's guilt.

(ECF No. 19-75 at 14-15.)

In his traverse, Petitioner submits that a more appropriate example of circumstantial evidence would have been the following-

> A baker is baking a cake and someone comes at the front counter. He goes to take care of the customer. In his absence, his assistant walks in the back room and sees that the cake icing is melting and the cake is about to fall. He rushes and catches it, and gets some icing on his hands. The baker returns at the same moment and infers a wrong conclusion that the assistant was trying to eat the cake. He fires his assistant based on a wrong circumstantial inference.

(ECF No. 51 at 55.)

Notwithstanding Petitioner's suggested example, he has not demonstrated how the trial court's example of circumstantial evidence "so infected the trial" that Petitioner's conviction violated due process. In fact, he has not shown any error – much less one of constitutional magnitude – with the trial court's instruction.

Petitioner further submits that the trial court erroneously failed to provide instructions that if the jury disagreed on Petitioner's mental state, it could have returned a guilty verdict for a lesser

included offense of murder. (ECF No. 6-7 at 9-10.) The record belies Petitioner's claim. When providing the elements of murder, the trial court did not instruct the jury that recklessness was a possible state of mind. The relevant portion of the trial court's murder jury instruction was as follows:

> Now, one of the elements the State must prove beyond a reasonable doubt is that the defendant acted purposely or knowingly. Either mental state is sufficient for the conviction. Does not have to be both, could be either one. Does everybody understand that?

(ECF No. 19-75 at 27.)

Petitioner next submits that the trial court's failure to require a unanimous causation finding on the murder charge was erroneous. (ECF Nos. 9-1 at 7-8, 6-6 at 31-33.) Petitioner adds that the trial court's equally misleading instruction on unanimity with respect to accomplice versus principal liability was erroneous. (ECF No. 9-1 at 11.) Petitioner raised this claim in a *pro se* supplemental filing on direct appeal and the Appellate Division denied it as meritless. *See Maqbool*, 2007 WL 1661133 at *3. Petitioner equates the principle of jury unanimity to the important criminal law doctrine of reasonable doubt. (ECF No. 9-1 at 5.) Petitioner also cites to portions of the jury instruction and argues that the "trial court's charge pertaining to elements of unanimity was extremely confusing." (*Id.* at 7.)

Respondents assert that this particular claim is unexhausted because it was not raised in Petitioner's petition for certification before the Supreme Court. (ECF No. 19 at 96-97.) In Petitioner's counseled petition for certification to the New Jersey Supreme Court, counsel relied on his appellate brief which only raised a small portion of the claims raised on direct appeal. (ECF No. 19-8 at 4.) Petitioner subsequently filed a *pro se* submission raising additional claims and asked the Court to consider his late filing. (ECF No. 19-9 at 5-6.) As noted, the New Jersey Supreme Court issued a one-page order denying certification less than a month after Petitioner's

filing.  The record is unclear whether Petitioner's *pro se* claims were ever considered by the

Supreme Court.  Nonetheless, the claim fails under both  a deferential AEDPA review and the less

stringent *de novo* standard. Petitioner further claims that appellate counsel was ineffective for

failing to raise this claim on appeal.  (ECF No. 6-7 at 25.)

At Petitioner's trial, the state elicited John Ahn's cause of death from medical examiner,

Dr. Krolikowski, who presented his medical opinion.  The defense also presented their medical

expert's conflicting opinion of Ahn's cause of death.   In light of this, the trial court explained to

the jury how the two conflicting medical examiners' opinions could be considered when applying

the causation instruction.

The relevant portions of the trial court's jury instruction on causation are as follows:

> Now, causation has a special meaning under the law.  To establish
> causation, the State must prove two elements beyond a reasonable
> doubt.  First, that but for the defendant's conduct, John Ahn would
> not have died.
>
> Second, that John Ahn's death must have been within the design or
> contemplation of the defendant.  If not, it must involve the same kind
> of injury or harm as that designed or contemplated, and it must also
> not be too remote, too accidental in its occurrence, or too dependent
> on another's volitional act to have a just or fair bearing on the
> defendant's liability, or on the gravity of his offense.
>
> In other words, the State must prove beyond a reasonable doubt that
> John Ahn's death was not so unexpected or unusual that it would be
> unjust to find the defendant guilty of murder.
>
> Let me give you a couple of examples, because that can be a difficult
> concept to understand.  If a defendant attempted to shoot his wife
> and he misses, with the result that his wife leaves and goes to her
> parents' country home, and while at the country home she takes a
> ride on a horse and falls off the horse and dies, nobody would think
> that the defendant would be guilty of murder, even though he did
> intend her death and attempt to kill her.
>
> While it would satisfy the but for component, if he didn't shoot at
> her she wouldn't have gone to her parents' house, the death there is

unconnected, so remote, so accidental in nature that it would be unfair to find the husband guilty of murder, to find that his act caused the death. Okay? Does everybody understand what I mean by that? If he hadn't shot at her she wouldn't have gone to her mother's. If she hadn't had gone to her mother's house, she wouldn't have rode the horse. We don't follow that out to make it so absurd or unfair to hold him accountable.

Take the same scenario just for a second, and say he shoots at her and misses, but she, in an attempt to escape, runs into the street and is hit by a bus, okay, and she's killed. But for his shooting at her she wouldn't have run into the street and she was killed by the bus. Now, was her death within his design or contemplation? Is it his plan? Is that what he was trying to accomplish was her death, and she was killed by a bus because of what he did, so but for his act, she would not have been in the street and been killed. And was her death really within his design and contemplation? Yea. So even though she didn't die from a gunshot wound, he's responsible for that death. He caused it in the framework of the law. That is causation. Okay? Everybody understand the difference?

We're talking about fairness, concepts of fairness that we're talking about. Is it so remote, so unconnected with the act that satisfies the but for requirement as to be unfair to hold him responsible for it, or is it connected to it, is it within his design, within his contemplation. Is that what he was trying to accomplish. It's not simply a question of time, you know, how long after, it's a fairness issue, is it fair to hold hi[m] responsible, is that what he was trying to accomplish was her death, and did he accomplish it. Okay? Do you understand in the context of those examples what we're talking about?

Now, in this case the defense has offered testimony bearing on the cause of John Ahn's death. The defense proffered the testimony of Dr. Zugibe, an expert in forensic pathology, to establish that there was no evidence of strangulation, as opposed to the testimony of Dr. Krolikowski, the State's pathologist, who stated John Ahn's death was caused by mechanical asphyxiation.

If you find beyond a reasonable doubt that the State's pathologist's testimony in conjunction with the other evidence in the case establishes that the defendant purposely or knowingly strangled John Ahn to death, then causation has been established.

However, if you find John Ahn was not strangled to death, but died of some other cause, then you must perform the two-step analysis

that I outlined for you a moment ago. First, that but for the acts of the defendant, would John Ahn have died on October 31, 2002.

Second, was the death of John Ahn within the design or contemplation of the defendant when he acted towards John Ahn. Obviously, your findings of fact regarding what acts of the defendant, if any, played a role in John Ahn's death are crucial on that point.

If you find that John Ahn's death occurred independent of any action on the part of the defendant, then the State has failed to prove that the defendant caused John Ahn's death. Even if you find that but for the actions of the defendant John Ahn would not have died on October 31, 2002, causation is not established unless the State further proves beyond a reasonable doubt that John Ahn's death was within the design or contemplation of the defendant when he acted towards John Ahn.

If you find beyond a reasonable doubt that the defendant strangled John Ahn, but before he could asphyxiate him he died of some other cause, heart attack or other, and that the defendant's attempt to asphyxiate John Ahn brought about his death, and further find that the death of John Ahn was what the defendant intended to accomplish by strangling him, then the State has proven the defendant caused John Ahn's death within the meaning of the law. Everybody understand what I mean by that?

Causation is important here for you to find the facts, and once again, let me remind you, I'm not giving you outcomes or possibilities here to steer you in any way, I'm just trying to explain the principle of causation. Everybody understand that?

Now, all jurors do not have to agree unanimously concerning which form of murder is present, so long as all believe that it was one form of murder or the other. However, for a defendant to be guilty of murder, all jurors must agree that the defendant either knowingly or purposely caused the death, or serious bodily injury resulting in the death of John Ahn. Okay?

Now, let's take a second to explain that to you, because it may seem to run counter to what you think about the law. In this case, the Legislature has said murder can be in one of two forms, either one is sufficient to be murder, and either one of two mental states is sufficient, so long as one is present. Okay? So if you find purposely that the defendant caused the death of John Ahn, it's murder. If you find knowingly caused the death of John Ahn, it's murder. If you

find purposely caused serious bodily injury resulting in the death of John Ahn, it's murder. If you find knowingly caused the death of John Ahn, that would be murder.

Now, six of you may believe that he purposely caused his death, six of you may believe he knowingly caused, or purposely caused serious bodily injury resulting in death, and your verdict would be guilty of murder, even though you're six-six as to which mental state he had, so long as you are all unanimous that he had one of the two required mental states, either purposeful or knowing conduct, and that he either caused his death, or caused serious bodily injury that then resulted in his death. Everybody understand that?

(ECF No. 19-75 at 32-38.)

Further, the relevant portion of the trial court's instructions on liability was as follows:

I have instructed you on the crime of murder as the law applies to a person who commits the murder by his own conduct. I must now instruct you on an alternate theory of accomplice liability. Under our law, a person can be guilty of an offense in two different ways. That part of our law dealing with responsibility for criminal acts reads as follows.

A person is guilty of an offense if it is committed by his own conduct, or the conduct of another person for which he is legally accountable, or both. A person who commits an offense by his own conduct is considered by the law to be a principal, and responsible for his own conduct. Everybody understand that concept? You do it yourself, you're responsible, you're the principal.

A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of an offense. A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating commission of the offense, he solicits such other person to commit it, and/or aids, or agrees, or attempts to aid such other person in planning or committing. Okay?

I'll run through that again for you just so that you got it clear. A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of the offense, he solicits such other person to commit it, or he aids, or agrees, or attempts to aid such other person in planning or committing it.

33

This provision of the law means that not only is the person who actually commits the criminal act responsible for it, but one who is legally accountable as an accomplice is also responsible. Now, this responsibility as an accomplice may be equal and the same as he who actually committed the crime or crimes, or they may be responsible in a different degree, depending on the circumstances as you find them to be. Now, I'll further explain that distinction to you in a moment.

In this case, the State contends the defendant was the principal in the murder of John Ahn, that he murdered John Ahn by his own conduct, that's what the State's contention is, and either a principal or accomplice in the murder of Muni Ahn. What role the defendant played in either or both of these alleged murders, if any, is for you to decide based on the evidence in the case.

If you find the State has failed to prove beyond a reasonable double that the defendant was a principal in either alleged murder, then you may consider whether the State has proven beyond a reasonable double that he acted as an accomplice to the person or persons who actually committed the offense or offenses. Everybody understand what I mean by that?

In this case, you find the defendant is equally guilty of the crimes committed by that other person because he acted as that person's accomplice with the purpose that the specific crime or crimes charged be committed. In order to find the defendant guilty of the specific crime of crimes charged, the State must prove beyond a reasonable doubt each of the following elements.

That another person or persons committed the crime of murder of either John Ahn or Muni Ahn. I've already explained murder to you, so I'm not going to do that again.

Second, that this defendant solicited the principal to commit those crimes, and/or did aid, or agree or attempt to aid the principal, the person who committed the offense in planning or committing.

Third, that this defendant's purpose was to promote or to facilitate, to bring about the commission of that offense or offenses.

And fourth, that this defendant possessed the criminal state of mind that's required to be proved against the person who actually committed the criminal act.

Remember that one acts purposely with respect to his or her conduct, or a result thereof, if it is his or her conscious object to engage in conduct of that nature, or to cause such a result.

Solicit means to strongly urge, to suggest, to lure or proposition. Aid means to assist, support, or supplement the efforts of another person. Agree to aid means to encourage by promise of assistance or support. Attempt to aid means that a person takes substantial steps in a course of conduct designed to, or planned to lend support or assistance in the efforts of another to cause the commission of a substantive offense.

If you find that the defendant, with the purpose of promoting or facilitating the commission of the offenses, solicited another person to commit them, and/or aided, or agreed, or attempted to aid them in planning or committing, then you should consider him as if he had committed the crimes himself.

Now, you have to consider accomplice liability separately as to each charge, assuming you find the defendant didn't act as a principal. If you find he acted as a principal, you don't need to consider accomplice liability. It can't be both in the commission of one offense. You can't be both the principal and an accomplice to yourself. Those things are mutually exclusive, and have to be considered separately.

And you can consider each case where the defendant is charged as a principal. If you find him not to be the principal, you may then consider whether or not he's responsible as an accomplice for that crime under the circumstances that I'm explaining to you. Everybody understand what I mean?

To prove the defendant's criminal liability, the State does not have to prove his accomplice status by direct evidence of a formal plan to commit the crime. There does not have to be a verbal agreement by all who are charged. The proof may be circumstantial. Participation and agreement can be established from conduct, as well as from spoken words. Mere presence at or near the scene does not make one a participant in the crime, nor does the failure of a spectator to interfere make him or her a participant in the crime. It is, however, a circumstance to be considered with the other evidence in determining whether he was present as an accomplice.

Presence is not, in itself, conclusive evidence of that fact. Whether presence has any probative value depends upon the total circumstances. To constitute guilt, there must exist a community of

35

purpose, an actual participation in the crime committed.  While mere presence at the scene of the perpetration of a crime does not render a person a participant in it, proof that one is present at the scene of the commission of the crime or crimes without disapproving or opposing it is evidence from which, in connection with other circumstances, it is possible for the jury to infer that he assented thereto, lent to it his countenance and approval, and was thereby aiding the same.  It depends on the totality of the circumstances as those circumstances appear from the evidence.

Now, an accomplice may be convicted on proof of the commission of a crime, or of his complicity therein, even though the person who it is claimed committed the crime has not been prosecuted, or has been convicted of a different offense or a degree of offense, or has immunity from prosecution or conviction, or has been acquitted.

Remember, this defendant can be held to be an accomplice with equal responsibility only if you find as a fact that he possessed the criminal state of mind that's required to be proved against the person who actually committed the criminal act.

In order to convict the defendant as an accomplice to the specific crime charged, you must find that the defendant had the purpose to participate in that particular crime.  You must act with the purpose of promoting or facilitating the commission of the substantive rime with which he is charged.  It is not sufficient to prove only that the defendant had knowledge that another person was going to commit the crime charged.  The State must prove that it was the defendant's conscious object that the specific conduct charged be committed.

In sum, in order to find the defendant guilty of committing the crime of murder as an accomplice, the State must prove each of the following elements beyond a reasonable doubt.

That another person committed the crime of murder of John Ahn, or another person committed the murder of Muni Ahn.

Second, that this defendant solicited that person, the principal actor, the person who committed the crime.  That this defendant solicited that principal to commit the crime, and did aid, or agree, or attempt to aid him in planning or committing.

Third, that this defendant's purpose was to promote or facilitate the commission of the offense.

Fourth, that this defendant possessed the criminal state of mind that's required to be proved against the person who actually committed the act, the principal.

Again, you have to consider these things separately. Each time you're going to consider his responsibility, they're to be considered separately, because his conduct and his mental states and his purpose may be different as to each crime that you're being asked to consider his responsibility for. Does everybody understand that?

If you find the State has proven each one of the elements as described above beyond a reasonable doubt, then you must find the defendant guilty of the particular crime you're considering.

If, on the other hand, you find the State's failed to prove one or more of these elements beyond a reasonable doubt, then you must find the defendant not guilty of being an accomplice on the crime that you're considering.

As I previously instructed you, any verdict in this area has to be unanimous, all 12 jurors must agree as to guilty or not guilty, with the exception, and I'm going to get to this in a minute, with the exception of the capital murder count, we're going to get to that later in these instructions, but as to all the other charges, they have to be unanimous verdicts.

(ECF No. 19-75 at 61-69.)

Liberally construing Petitioner's claim, he appears to be making a Fourteenth Amendment due process argument. Here, the trial court required jury unanimity with respect to a finding of guilt. However, the jury was not required under the Due Process Clause to have unanimous decisions on which theory of causation resulted in the victim's death. *See United States v. Yeaman*, 194 F.3d 442, 453 (3d Cir. 1999) (holding that while a defendant in a federal criminal trial has a right to a unanimous verdict, that does not equate to "an instruction requiring unanimous agreement on the means by which each element is satisfied." ) Similarly, Petitioner's argument that the trial court gave a vague instruction on the unanimity requirement for accomplice versus principal liability, fails. Petitioner's claim that the jury instruction on accomplice liability did not

prohibit the jury from considering a lesser included offense is belied by the record. The trial court's instruction was clear and accurate. Accordingly, Petitioner fails to establish a valid constitutional claim. Therefore, Petitioner has not met his burden under a *de novo* or AEDPA standard of review. Finally, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174.

Next, Petitioner claims that the trial court advanced an additional theory of the case when it charged the jury with the lesser included offenses of murder, such as aggravated manslaughter. (ECF No. 9-1 at 8.) This claim is unexhausted as Petitioner raises this issue for the first time on federal habeas review. Nonetheless, this Court will reach the merits *de novo*.

The trial record reflects that there were no objections to the jury instruction on aggravated manslaughter with respect to John Ahn, either at the charge conference or in the presence of the jury. (ECF Nos. 19-72 at 8, 19-75 at 40.) Petitioner argues that he was not "provided with a notice of this entirely new allegation." (ECF No. 9-1 at 8-9.) The Court agrees with Respondents deduction, that "Petitioner fails to recognize that the charge that was given was a lesser included charge to the murder relating to Joong Ahn." (ECF No. 19 at 99.) *See Wallace v. Glover*, No. 09-4494, 2013 WL 1352250 at *13 (D.N.J. Apr. 2, 2013) (held that trial court's *sua sponte* lesser-included jury instruction was not unconstitutional because it did not relieve the government of its burden to prove every element of the crime). Petitioner fails to sufficiently raise a claim for federal habeas relief under this argument. Accordingly, this claim will be denied.

In sum, Petitioner has not demonstrated how the jury instructions in any of the foregoing claims warrant federal habeas relief. The trial court's instructions were not violative of Petitioner's due process. Therefore, Petitioner has not met his burden under a *de novo* or AEDPA standard of review. Moreover, appellate counsel cannot be deemed ineffective for failing to raise an issue that

would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. Therefore, Petitioner is not entitled to habeas relief on any of these claims.

    B.    Ineffective Assistance of Counsel Claims

       Next, the Court will address Petitioner's ineffective assistance of counsel claims. Petitioner was represented by two attorneys at trial, Ms. Elise DiNardo, Esq. and Mr. Raymond Beam Esq. He was subsequently represented in his direct appeal by Mr. Jay L. Wilensky, Esq.

       The Supreme Court set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. This requirement involves demonstrating that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687. Second, the defendant must show that he was prejudiced by the deficient performance. *Id.* This requires showing that counsel's errors deprived the defendant of a fair trial. *Id.*

       Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance." *Id.* at 690. In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. In addition, judges must consider the facts of the case at the time of counsel's conduct, and must make every effort to escape what the *Strickland* court referred to as the "distorting effects of hindsight." *Id.* The petitioner bears the burden of showing that counsel's challenged action was not sound strategy. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694.

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Cullen v. Pinholster*, 131 S.Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted). "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d. Cir. 2010) (quoting *Strickland*, 466 U.S. at 697)).

Ineffective assistance of appellate counsel is analyzed under the *Strickland* standard as well. *See Albrecht v. Horn*, 485 F.3d 103, 137 (3d Cir. 2007) (quoting *United States v. Mannino*, 212 F.3d 835, 840 n.4 (3d Cir. 2000)). The two-part *Strickland* test requires this court to first determine whether counsel's performance was deficient, which in the context of an appeal requires evaluation of counsel's failure to raise proper issues on appeal. *See Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) ('[I]t is a well established principle that counsel decides which issues to pursue on appeal.") Secondly, Petitioner must show that but for his counsel's failure to raise the

omitted issue, he would have prevailed on his appeal. *Pichardo v. Nelson*, No. 13-6930, 2015 WL 9412918 at *11 (D.N.J. Dec. 22, 2015) (quoting *Smith v. Robbins*, 528 U.S. 259, 285 (2000)).

Petitioner argues that his trial counsel's failure to object to the admission of his custodial statements in violation of his right to remain silent pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), constituted ineffective assistance. (ECF No. 9 at 33-42.) It should be noted that Petitioner argues that he did not provide a statement at all, however, if this Court determines that he did, that statement was in violation of his right to remain silent. (*Id.* at 33.) Petitioner initially[6] raised the bulk of his statement related ineffective assistance claims in his PCR petition. (*Id.*) The PCR Court summarily denied this claim along with other "remaining issues advanced in Counsel's Brief [because they were] either procedurally barred, rely upon either bald assertions or are supported by factual assertions of the Defendant and are therefore without merit." (ECF No. 19-90 at 19-30.) The Appellate Division subsequently denied all of Petitioner's claims related to his custodial statements. *State v. Maqbool*, Indictment No. 03-03-0430, 2013 WL 57683 *7 (N.J. Super. Ct. App. Div. Jan. 7, 2013).

   1. Counsel's Ineffectiveness as to Statements in Violation of Petitioner's Fifth
      Amendment Rights

Petitioner argues that his trial and appellate counsel were ineffective for failing to suppress his unlawfully obtained custodial statements to police. (ECF No. 6-6 at 16-18). More specifically, Petitioner argues that the trial court's prohibition of any testimony of Petitioner's refusal to provide his cell phone password in order to obtain a purportedly exculpatory telephone recording that

---

[6] Petitioner unsuccessfully raised Fifth Amendment claims on direct appeal, however his argument has since been modified to challenge, *inter alia*, the constitutionality of the actual waiver form. On direct appeal, Petitioner challenged admission of the custodial statements based on his arrest on an invalid warrant, and his speaking with detectives while unaware that a criminal complaint was filed or was soon to be filed against him therefore impacting his ability to knowingly waive his right to remain silent. *Maqbool*, 2007 WL 1661133 at *3-11.

Petitioner informed Detective Russo of during the police interview was a determination that Petitioner had invoked his right to remain silent. (*Id.*) Furthermore, he now submits that appellate counsel was equally ineffective for failing to raise this claim on appeal. (ECF No. 6-7 at 25-27.)

The Appellate Division found Petitioner's claims to be meritless citing Rule 2:11-3(e)(2), adding briefly:

> Defendant has not demonstrated how the result would have been different had counsel undertaken the tasks defendant now claims should have been performed. For that reason, his claims again amount to the "bald assertions" that we held in *Cummings* were insufficient to support a claim of ineffective assistance of counsel. *Supra*, 321 N.J. Super at 170. In any event, defense counsel filed a suppression motion which was adequately argued and then properly denied.

*See Maqbool*, 2013 WL 57683 at *8.

First, with respect to Petitioner's argument that the custodial statement was erroneously admitted into evidence despite his invoking his right to counsel, the record belies Petitioner's assertion. Petitioner submits that the trial court and the prosecution conceded that Petitioner invoked his right to remain silent when Petitioner declined to provide the questioning detectives with his cell phone passcode. (ECF No. 6-6 at 18.) The record reflects otherwise. The trial court and prosecution agreed that Petitioner's refusal to provide his phone passcode was "his evidencing the fact that he would not cooperate, that is, in essence, an exercise of his constitutional right not to do so." (ECF No. 19-60 at 40.) Nowhere in the record did the trial court or the prosecution articulate that Petitioner's withholding the passcode was an invocation of his right to remain silent.

Moreover, Petitioner's argument is inconsistent with his own testimony at the pre-trial suppression hearing. The trial court conducted a suppression hearing to address the merits of Petitioner's motion to suppress that had been filed by Petitioner's trial counsel. (ECF Nos. 19-51, 19-52). At that hearing, Petitioner testified that he invoked his right to counsel almost immediately

after arriving in the interrogation room. (ECF No. 19-52 at 20.) He testified that he unsuccessfully asked for an attorney a few times more. (*Id.* at 21-23.) Petitioner added that he refused to sign the waiver of rights form that the detectives presented to him and he did not sign the form until hours after questioning ended. (*Id.* at 24-25.)

Here, Petitioner has not demonstrated how trial counsel's performance was deficient. The record reflects that his counsel moved for a pre-trial suppression hearing. Further, at Petitioner's trial, counsel successfully requested the court to prohibit Lieutenant Russo from testifying about Petitioner's refusal to provide his cell phone password as well as his eventual invocation of his right to counsel. (ECF No. 19-60 at 40.) Petitioner acknowledges that his trial counsel addressed the issue of the potential for prejudice should the interviewing detective testify about Petitioner's refusal to provide his passcode and his eventual request for counsel. (*Id.*) However, Petitioner's argument appears to conflate the trial court's ruling that prohibited any testimony mentioning Petitioner's refusal to provide his cell phone passcode with Petitioner's eventual invocation of his right to counsel. The trial court never ruled that Petitioner withholding his cell phone password was indicative of his refusal to be interviewed altogether. Nor did the trial court provide any Fifth Amendment ruling with respect to Petitioner's withholding his cell phone password. *See Davis v. United States*, 512 U.S. 452, 459 (1994) (To invoke the right to counsel, a defendant must unambiguously request the assistance of counsel.) Therefore, Petitioner has not articulated a valid Fifth Amendment claim that trial counsel could have successfully raised.

Moreover, as to the Fourth Amendment, Petitioner has not demonstrated how his refusal to provide his cell phone password affected the outcome of the proceeding. The purported recording on his cell phone was never recovered or used in the case against him. As such, a search or seizure that would implicate Petitioner's Fourth Amendment rights did not occur.

Petitioner also argues that his right to counsel was also violated "when he refused to answer questions posed by the unknown detective." (*Id.* at 18.) Petitioner does not provide any additional facts to support this argument. Although Petitioner references his "memorandum of law in support," that submission does not include any facts in support of this claim either. Therefore, this claim is conclusory without any facts or support and does not merit relief.

For the foregoing reasons, this ineffective assistance of counsel claim fails. Petitioner has failed to show any instances of deficient performance by counsel, which would give rise to a claim of constitutional deprivation. Moreover, even if there was any small instance of counsel's deficiency, Petitioner has not established the second prong of prejudice. The Appellate Division's ruling was not an unreasonable application of clearly established federal law. Moreover, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl,* 166 F.3d at 174. Accordingly, this claim will be denied.

2.  Counsel's Ineffectiveness as to Statements in Violation of Petitioner's Fourth Amendment Rights

Petitioner next argues that while trial counsel filed a motion to suppress his custodial statements, they failed to do so on the basis of Petitioner's illegal arrest. (ECF No. 6-6 at 19.) While this claim was raised in Petitioner's *pro se* filings on direct appeal, the claim was summarily denied by the Appellate Division as meritless. *See Maqbool*, 2007 WL 1661133 at *3. Nonetheless, this Court has also considered the Appellate Division's analysis of Petitioner's similar argument, that the statement should have been suppressed because he was not apprised of a criminal complaint against him. Furthermore, Petitioner now submits that appellate counsel was equally ineffective for failing to raise this claim on appeal. (ECF No. 6-7 at 25-27.)

44

Petitioner claims that "[t]he Complaint/Warrant provided in discovery unquestionably shows the complaint sworn before a non-judicial officer on November 4, 2002, one day after petitioner had already been arrested.  Moreover, at the hearings, held on December 14 and 15, 2004, counsel were apprised of the illegal arrest of petitioner through the testimonies of Det. Russo and Det. Wagner."

To make a Fourth Amendment claim for false arrest, a Petitioner must allege two elements: (1) that there was an arrest; and (2) that the arrest was made without probable cause.  *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988).  Probable Cause "requires more than mere suspicion; however, it does not require that the officer have evidence to prove guilt beyond a reasonable doubt." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995).  Rather, probable cause exists when the facts and circumstances are "sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S. Ct. 854, 43 L.Ed.2d 54 (1975) (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L.E.d.2d 142 (1964)); *Sharrar v. Felsing*, 128 F.3d 810, 817 (3d Cir. 1997).

Here, the facts do not support Petitioner's right to relief.  The record reflects that Petitioner was arrested in a public location after an eyewitness provided information about Petitioner's involvement in both decedents' murders.  *See United States v. McGlory*, 968 F.2d 309, 342 (3d Cir. 1992) (citations and internal quotation marks omitted) ("Law enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has committed a felony.")  Petitioner has not shown lack of probable cause.  Moreover, Petitioner's own submission provides that Detective Russo indicated at the commencement of the interview that he was aware of Petitioner's involvement in the offense.

45

(ECF No 6-6 at 19.)  Consequently, Petitioner has not demonstrated how trial counsel's decision not to pursue this argument implicated either *Strickland* prong.  *See Strickland*, 466 U.S. at 687, 692-93.  The state court did not unreasonably apply clearly established federal law.  Moreover, to the extent that Petitioner now claims that appellate counsel was ineffective, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction.  *See Buehl*, 166 F.3d at 174.  Accordingly, this claim will be denied.

3.  Counsel's Ineffectiveness as to Waiver Form

Petitioner claims that the Hudson County Prosecutor's Office used a vague and confusing interrogation waiver form that "is unconstitutional on its face because it is by nature, designed to coerce or, at least, dupe suspects into waiving their rights."  (ECF No. 9 at 35.)  The Appellate Division summarily denied this claim.  *See Maqbool*, 2013 WL 57683 at *8.  Furthermore, Petitioner now also submits that appellate counsel was equally ineffective for failing to raise this claim on appeal.  (ECF No. 6-7 at 25.)

The crux of Petitioner's argument is that the waiver form he signed consolidates the language that indicates acknowledgement of a suspect's rights pursuant to *Miranda*, with the waiver of those rights.  He further argues that had counsel raised this issue "there is a reasonable probability that the trial court would have suppressed the Petitioner's statement, and the outcome of the trial proceedings would have been different."  (*Id.* at 41.)  Petitioner contrasts the form he signed to those used by other law enforcement agencies, which either use separate forms for the acknowledgement and for the waiver or separate the acknowledgement and waiver into two separate clauses.  (*Id.* at 37-38.)

46

The specific waiver form at issue in this case is a typed one-page document used by the Hudson County Prosecutor's Office.  (ECF No. 9-8 at 15.)  For purposes of this particular claim, the relevant portion begins with the sentence, "Before we ask you any questions, you must understand your rights."  It proceeds to list the interviewee's *Miranda* rights.  (*Id.*)  In the middle of the page, "waiver of rights" is written in all capital letters, centered and underlined.  (*Id.*)  Following that, the following phrase is printed:

> I have read this statement of my rights and I understand what my rights are.  I am willing to make a statement and answer questions. I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me no pressure of coercion of any kind has been used against me.

(*Id.*)

Immediately below this statement is Petitioner's signature as well as two witnesses' signatures along with the time.  (*Id.*)  The form includes two blank lines where the time can be entered.  There is an area at the top of the form, which states, "4:15 PM", in handwriting.  There is another area at the bottom of the form which states, "4:17 PM", in handwriting.

Although, the Supreme Court has never addressed what specifications would meet *Miranda* requirements with respect to *Miranda* waiver forms, it has addressed challenges to the actual *Miranda* rights that are provided to suspects.  In *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989), the Court held that *Miranda* warnings are not formulaic and do not require that law enforcement recite the rights exactly as provided in the *Miranda* decision.  See *id.* ("Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement.  The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*.") (citation and quotation marks omitted).

Petitioner relies on a case from another circuit, *United States v. Obregon*, 748 F.2d 1371, 1381 (10th Cir. 1984), to support his position that separate forms for acknowledgement of rights

and waiver be used.  (*Id.*)  *Obregon* involved a suspect who initially invoked his *Miranda* rights but later read the rights form and waived his right to remain silent in the presence of another officer who was unaware of the suspect's earlier invocation.  *Obregon*, 748 F.2d at 1377.  Here, Petitioner invoked his right to counsel after speaking to law enforcement about the extent, however limited, of his involvement in the murders.  Critically, the Tenth Circuit held that Obregon's statement should not have been suppressed because his waiver was valid.  Petitioner's reference to the *Obregon* court's  suggestion that law enforcement officials adopt a practice of using two, distinct waiver forms does not undermine the validity of his waiver in this case.

Petitioner has not demonstrated how the waiver form that he signed was inconsistent with *Miranda's* requirements.  Therefore, counsel's supposed failure to raise this issue does not constitute ineffective assistance.  The Appellate Division did not unreasonably apply clearly established federal law.  Moreover, to the extent that Petitioner now claims that appellate counsel was ineffective, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction.  *See Buehl*, 166 F.3d at 174. Accordingly, this claim will be denied.

4.   Counsel's Ineffectiveness as to Failing to Object to the Trial Court's Ruling

Petitioner next submits that trial counsel was ineffective for failing to object to the trial court's shifting of the burden of proof on the issue of the voluntariness of his waiver.  (ECF No. 6-6 at 14-16.)  The Appellate Division summarily denied this claim.  *See Maqbool*, 2013 WL 57683 at *8.  Furthermore, Petitioner now also submits that appellate counsel was equally ineffective for failing to raise this claim on appeal.  (ECF No. 6-7 at 25-27.)

Petitioner argues that the following statement from the trial judge at the close of Petitioner's pre-trial suppression hearing demonstrates the alleged burden shifting: "[T]here was

absolutely no doubt that Mr. Maqbool understood the police intended to arrest him in connection

with double homicide," and that "there's no question in this matter that a reasonable man in Mr.

Maqbool's position would quite clearly understand that he was the focus of a murder

investigation." *Id.* at 16.    Petitioner also submits that the "trial court's holdings pronounced to

the petitioner that, he is basically guilty and, he should have known that the police was going to

arrest him for murder." (*Id.*)

    Despite Petitioner's argument to the contrary, the trial judge's statement does not indicate

burden shifting.  The record reflects that after hearing all of the testimony including Petitioner's,

the trial court denied the motion to suppress Petitioner's custodial statements.  (ECF No. 19-52 at

68-77.)  Additionally, the record reflects that the trial court re-iterated that it was the state's burden

to prove that Petitioner's waiver was knowing, voluntary and intelligent.  (*Id.* at 68.)

    In light of this record, Petitioner has not demonstrated that the alleged burden shifting

occurred.  Consequently, trial counsel could not be deemed ineffective for failing to object.

Petitioner has not demonstrated how the outcome of his trial would have been different if counsel

had objected to a purported trial court error that is belied by the record.  *See Marshall v. Hendricks*,

307 F.3d 36, 94 (3d Cir. 2002).  Accordingly, the state court's decision was not an unreasonable

application of clearly established federal law.  Moreover, appellate counsel cannot be deemed

ineffective for failing to raise an issue that would not have resulted in the reversal of his client's

conviction.  *See Buehl,* 166 F.3d at 174.  Accordingly, this claim will be denied.

   5. Counsel's Ineffectiveness as to Failing to Object to Admission of Inadmissible
      Hearsay

    Petitioner's next claim of ineffective assistance of trial counsel stems from an alleged

Confrontation Clause violation during the Lieutenant Russo's direct examination.  (ECF No. 9 at

49, 53.)  Petitioner further argues that his trial counsel "failed to recognize Russo's false assertions

during his testimony." (*Id.*) Petitioner also claims that appellate counsel failed to raise this claim

on appeal. (*Id.* at 53-57.) The Appellate Division summarily denied those claims as lacking merit.

*See Maqbool*, 2013 WL 57683 at *8.

At trial, Lieutenant Russo gave the following testimony when describing parts of

Petitioner's custodial interview:

> PROSECUTOR: Why did you tell him that what he was saying was
> not the truth?
> RUSSO: Well, during the course of this interview I was being fed-
> BEAM: Objection, Judge.
> RUSSO: I'm sorry.
> THE COURT: Don't tell us specific information, sir, about what
> you were told. The fact that you may have been told something is
> not objected to, but don't tell us what you've been told.
> RUSSO: I learned?
> THE COURT: I want you to tell us what you did. The fact that
> someone may have told you something that led you to do something
> is okay. I don't want you to tell us what they told you.
> RUSSO: During an interview, which is a normal procedure, I would
> on occasion leave the room and be instructed as to what is going on
> as far as the investigation is, which way its turning, therefore, I could
> get ammunition when I go back in a room and find out are we telling
> the truth, are we on the right course of gaining the truth, and I ended
> up knowing that.
> PROSECUTOR: Did you tell the defendant any information that
> you had gotten?
> RUSSO: Referring to my notes.
> PROSECUTOR: Referring to your report, sir?
> RUSSO: I'm sorry, my report. I told Tariq that Zaid and Maribel
> were being spoken to - -
> DINARDO: Again, objection.
> RUSSO: I'm sorry.
> THE COURT: I'll hear you at side bar on that.
>                   (The following takes place at side bar.)
> THE COURT: So far his response is not objectionable.
> DINARDO: Well, he's going to say what Maribel and Zaid said,
> because he's –
> THE COURT: I've instructed him not to do that, and I have no
> reason to anticipate that he will.
> PROSECUTOR: He's been instructed not to, Judge. I think what
> he said so far -.
> THE COURT: It's perfectly fine, there's no objection to that.

MR. BEAM: Judge, this is no different than situation where a police officer says I spoke with a confidential informant, and after I spoke with the confidential informant I locked up somebody else. It clearly –

THE COURT: No, I think it's clearly different than that, sir. Sir, what he's doing is reporting a fact, and that is, that Maribel and Zaid were being spoken to. That's a fact.

MR. BEAM: And what he said is that based on that I, basically, that this guy wasn't telling the truth, so it's inferring to the jury what they know that these two other people are saying.

THE COURT: It may very well be, I mean, that's the subject of cross-examination, but it's not - - that's what the State wants the jury to get, that this witness believed, based on information that he got, that he wasn't getting the truth from your client. That's what he did.

MR. BEAM: All right. As long as that's on the record, that's all I can do.

THE COURT: It's on the record.

(The following takes place in open court.)

PROSECUTOR: Judge, could I just have that last answer read back?

(The reporter reads back the last answer.)

PROSECUTOR: When did you tell the defendant that Zaid and Maribel were being spoken to?

RUSSO: Right before we took a break.

PROSECUTOR: After he gave the first version of events?

RUSSO: Correct.

(ECF No. 19-60 at 72-74.)

For hearsay purposes, a statement is a "person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Here, the Petitioner has not identified any of Zaid or Maribel's purported hearsay statements that were admitted at trial. At trial, Lieutenant Russo testified that he questioned the veracity of Petitioner's custodial statement because he was also learning information from Zaid and Mirabel around the same time that Petitioner was in an interview room. (ECF No. 19-60 at 72-74.) The trial court gave a clear instruction to the witness that he could not testify about what Zaid or Maribel said. The prosecution's reason for eliciting the testimony about Lieutenant Russo's reference to Zaid and Maribel's interview was to convey that it was used to coax Petitioner into telling the truth.

Petitioner nonetheless argues, "the prosecutor knew or should have known that Andy, Maribel and Zaid were not questioned until after Petitioner's interrogation, and that Russo was not being truthful as other witnesses were simultaneously being questioned when the Petitioner was being interrogated." (ECF No. 9 at 48.)

Petitioner also argues that appellate counsel was ineffective for failing to raise this issue. (*Id.* at 49, ECF No. 6-7 at 25-27.) Petitioner has failed to meet the first *Strickland* prong, showing that his appellate counsel's failure to raise the hearsay admission "fell outside the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Trial counsel's objection to the statement and the subsequent sidebar discussion provided a robust record for direct appeal counsel to analyze. After reviewing the trial court's basis for admitting the contested statement, appellate counsel may have deemed it an unmeritorious argument to raise before the Appellate Division. Moreover, appellate counsel may have considered the unlikelihood of satisfying *Strickland's* prejudice prong even if he did raise this claim. Therefore, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. The state court's decision to deny this claim was not an unreasonable application of clearly established federal law. Accordingly, this claim will be denied.

6.  Counsel's Ineffectiveness as to Failing to Object to the Prosecutor's Closing

Petitioner alleges that trial counsel's failure to object to the prosecutor's closing arguments where he referred to inadmissible hearsay constituted ineffective assistance of counsel. (ECF Nos. 9 at 49-57, 6-6 at 3.) The Appellate Division summarily denied this claim as unmeritorious. *See Maqbool*, 2013 WL 57683 at *8. Petitioner further claims that appellate counsel failed to raise this claim on appeal. (ECF No. 6-7 at 25.)

During the prosecution's closing arguments, several references were made to Mir's trial testimony, detailing what he and Amit "Andy" Vishal experienced during those last few days of October 2002 and first few days of November 2002. The closing arguments never mentioned any statements made by Andy. The excerpts of the closing arguments that Petitioner cites to only cite to all the instances that the prosecutor mentioned Andy's name. (ECF No. 9 at 51-52.) Given that the closing arguments did not refer to any hearsay[7] statements, trial counsel was not ineffective for not making a legally invalid objection. *See Werts v. Vaughn*, 228 F.3d 178, 206 (3d Cir. 2000) (held that state court's determination that trial counsel's failure to object to prosecutor's remarks was not an unreasonable application of *Strickland*.). The state court's application of clearly established federal law was not unreasonable. Moreover, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl,* 166 F.3d at 174. Accordingly, this claim will be denied.

7.  Counsel's Ineffectiveness for Failing to Object to Prosecutor Improperly Vouching for a Witness.

Petitioner next argues that his trial counsel failed to object to the prosecutor's improper witness vouching during closing arguments. (ECF No. 6-6 at 3-4.) The Appellate Division denied this claim as unmeritorious, adding briefly that "nothing the prosecutor said or did while examining witnesses or delivering his closing argument deprived defendant of a fair trial." *See Maqbool*, 2013 WL 57683 at *8. Petitioner further claims now that appellate counsel failed to raise this claim on appeal. (ECF No. 6-7 at 25.)

The relevant portion of the prosecutor's closing arguments is as follows:

---

[7] The Federal Rules of Evidence define hearsay as "a statement that (1) the declarant does not make while testifiying at the current trial or hearing: and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801 (c).

>Now, these statements came through Lieutenant Russo. You saw
>Lieutenant Russo testify. I will suggest to you that Lieutenant Russo
>was very truthful what he testified to. I don't see how you can see
>it any other way. I don't see how you could think that Lieutenant
>Russo got up there, do you think he actually made up these alibis
>himself? Do you think that's what we have a lieutenant doing,
>making up excuses for someone else? It just doesn't make any
>sense, because these aren't confessions, they're alibis. But they're
>alibis that, when considered with the other evidence just don't make
>any sense.

(ECF No. 19-74 at 61.)

The prohibition of improper statements by a prosecutor falls within the ambit of rights

afforded to a criminal defendant. *See United States v. Young*, 470 U.S. 1, 7 (1985) ("Prosecutors

sometimes breach their duty to refrain from overzealous conduct by commenting on the

defendant's guilt and offering unsolicited personal views on the evidence.") "On habeas review,

however, prosecutorial misconduct such as vouching does not rise to the level of a federal due

process violation unless it affects fundamental fairness of the trial. James S. Liebman & Randy

Hertz, *Federal Habeas Corpus Practice and Procedure* § 9.1, p. 371 (1998). Thus, habeas relief

is not available simply because the prosecutor's remarks were undesirable or even universally

condemned. The relevant question for a habeas court is whether those remarks so infected the trial

with unfairness as to make the resulting conviction a denial of due process." *Lam v. Kelchner*, 304

F.3d 256, 271-72 (3d Cir. 2002) (citations and internal quotation marks omitted.)

Petitioner has not demonstrated how counsel's performance satisfies either of the

*Strickland* prongs. First, trial counsel's performance cannot be deemed deficient in light of the

prosecutor's statements. The state court held that the prosecutor's closing arguments did not run

afoul of Petitioner's right to a fair trial. This Court agrees. *See Maqbool*, 2013 WL 57683 at *8.

The prosecutor's comments about Detective Russo's testimony were not premised on any

extraneous knowledge about Detective Russo, but rather were made within the context of

Petitioner's statements to the detective and the other evidence that was presented to the jury.  *See United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 283 (3d Cir. 1999) ("Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury.") (citation omitted).  The one valid objection to the prosecutor's closing would have been the injection of the prosecutor's personal opinion.  However, the prosecutor's entire closing argument, while unfavorable to the Petitioner, was not unfair.  Because the prosecutor's conduct was not constitutionally improper, the Petitioner cannot establish a Sixth Amendment violation based on his attorney's failure to object to the prosecutor's arguments.

The state court's decision to deny this claim was not an unreasonable application of clearly established federal law.  Moreover, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction.  *See Buehl*, 166 F.3d at 174.  Accordingly, this ground for a writ of habeas corpus will be denied.

8.  Counsel's Ineffectiveness for Failing to Object to Prosecutor Suborning Perjury

Petitioner submits that trial counsel's failure to object to the prosecution's alleged subornation of perjury from state witness Lieutenant Russo during the pre-trial suppression hearing as well as at trial, constituted ineffective assistance.  (ECF No. 9 at 42.)   The Appellate Division denied this claim as unmeritorious, adding briefly that "nothing the prosecutor said or did while examining witnesses or delivering his closing argument deprived defendant of a fair trial."  *See Maqbool*, 2013 WL 57683 at *8.  Petitioner further claims that appellate counsel failed to raise this claim on appeal.  (ECF No. 6-7 at 25.)

At trial, Lieutenant Russo gave the following testimony when describing parts of Petitioner's custodial interview.

55

PROSECUTOR:  Why did you tell him that what he was saying was not the truth?

RUSSO:  Well, during the course of this interview I was being fed-

BEAM:  Objection, Judge.

RUSSO:  I'm sorry.

THE COURT:  Don't tell us specific information, sir, about what you were told. The fact that you may have been told something is not objected to, but don't tell us what you've been told.

RUSSO:  I learned?

THE COURT:  I want you to tell us what you did.  The fact that someone may have told you something that led you to do something is okay.  I don't want you to tell us what they told you.

RUSSO:  During an interview, which is a normal procedure, I would on occasion leave the room and be instructed as to what is going on as far as the investigation is, which way its turning, therefore, I could get ammunition when I go back in a room and find out are we telling the truth, are we on the right course of gaining the truth, and I ended up knowing that.

PROSECUTOR:  Did you tell the defendant any information that you had gotten?

RUSSO:  Referring to my notes.

PROSECUTOR:  Referring to your report, sir?

RUSSO:  I'm sorry, my report.  I told Tariq that Zaid and Maribel were being spoken to

(ECF No. 19-60 at 72-73.)

Lieutenant Russo testified that he questioned the veracity of Petitioner's custodial statement because he was also obtaining case-related information from his colleagues.  Lieutenant Russo's reference to Zaid Tariq and Maribel Aquino's interview was used to coax Petitioner into telling the truth.  Petitioner nonetheless argues "the prosecutor knew or should have known that Andy, Maribel  and Zaid were not questioned until after Petitioner's interrogation, and that Russo was not being truthful as no other witnesses were simultaneously being questioned when the Petitioner was being interrogated."  (ECF No. 9 at 48.)  Petitioner further argues that his trial counsel "failed to recognize Russo's false assertions during his testimony."  (*Id.*)

Allegations involving the prosecution's knowing use of perjured testimony are governed by the rule articulated by the Supreme Court in *Napue v. Illinois*, 360 U.S. 264 (1959).  There, the Supreme Court held that the state violates the Fourteenth Amendment's due process protection

when it "knowingly presents or fails to correct false testimony in a criminal proceeding." *Id.* at 269. Moreover, "[a] conviction must be set aside even if the false testimony goes only to a witness's credibility rather than the defendant's guilt." *Haskell v. Superintendent*, 866 F.3d 139, 146 (3d Cir. 2017). To establish such a claim, Petitioner must show that: (1) "[the witness] committed perjury, (2) the [prosecution] knew or should have known that the testimony was false, (3) the false testimony was not corrected, and (4) there is a reasonable likelihood that the perjured testimony could have affected the judgment of the jury." *Id.* (citation omitted).

Petitioner has not demonstrated how Russo's testimony was not truthful. Both Petitioner's girlfriend Maribel Aquino and Detective Ted Wagner testified that members of law enforcement went to Aquino's residence and retrieved case-related evidence on the same day that Petitioner was interviewed. (ECF Nos. 19-60 at 18-23, 19-67 at 54-55.) Aquino also accompanied the investigators back to their office for further questioning. (*Id.*) Even if Aquino was not yet formally interviewed, she may have provided information about the case to the investigators by the time Petitioner met with Lieutenant Russo. Russo's testimony that his colleagues were providing him with case-related information while Petitioner was being interviewed does not appear to be unrealistic within this context. Petitioner certainly has not shown that it was untruthful. Therefore, Petitioner has not established how the prosecution used purportedly perjured testimony. Consequently, Petitioner has not established that a *Napue* violation occurred. As a result, he has not established who counsel was ineffective for not objecting. The state court's decision to deny this claim was not an unreasonable application of clearly established federal law. Moreover, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl,* 166 F.3d at 174. Accordingly, this claim will be denied.

9.  Counsel's Ineffectiveness for Failing to Properly Advise Petitioner of His
Sentence Exposure if Found Guilty After a Trial

Petitioner next argues that trial counsel failed to advise him "that his potential sentence

exposure would be two consecutive life sentences, nor did counsel explain the severity of monetary

fines, parole brackets, and No Early Release Act ("NERA") applications that would be imposed."

(ECF No. 6-6 at 7.)  The Appellate Division summarily denied this claim.  *See Maqbool*, 2013 WL

57683 at *8.  Petitioner now also submits that appellate counsel was equally ineffective for failing

to raise this claim on appeal.  (ECF No. 6-7 at 25.)

Petitioner claims that he was "assured by the trial counsel, Ms. Elise DiNardo, that death

penalty was a non-issue, as the State of New Jersey did not execute anyone for over 40 years."

(*Id.*)

The Appellate Division denied this particular claim as follows-

> Defendant next asserts his trial counsel was ineffective because he
> failed to advise him that, if convicted, he faced the possibility of
> receiving two consecutive life sentences. Because he allegedly did
> not know of his true sentencing exposure, defendant contends he did
> not pursue available plea agreements. This argument also lacks
> merit.
>
> Defendant was obviously aware that, if he were convicted, he could
> face the death penalty. As Judge De Pascale observed "[i]f the
> exposure to a death sentence was not enough to cause [d]efendant to
> consider the State's plea offer, it is unlikely that his awareness of the
> possibility of a lesser sentence would have done so." Moreover,
> other than defendant's "bald assertion," there is nothing in the record
> to support his claim that he was not aware of the full range of
> sentences for the offenses that were the subject of the trial.
> *Cummings*, *supra*, 321 N.J.Super. at 170.

*See Maqbool*, 2013 WL 57683 at *7.

Ineffective assistance of counsel claims arising out of the plea process are analyzed under

the *Strickland* standard.  *See Hill v. Lockhart*, 474 U.S. 52 (1985).  Claims of ineffective assistance

of counsel in the context of a defendant rejecting a plea offer are considered under the standard set in *Lafler v. Cooper*, 566 U.S. 156 (2012). The Court in *Lafler* considered the claims of a petitioner who was allegedly advised by trial counsel to reject the plea offer based on the likelihood of his acquittal at trial. *Id.* at 163. As with all ineffective assistance of counsel claims, the petitioner is required to show that counsel's performance was deficient. *Strickland*, 466 U.S. 668 at 687. Secondly, the petitioner must show that the deficient performance was prejudicial. *Id.* The petitioner's showing that "the outcome of the plea process would have been different with competent advice" is dipositive in establishing Strickland's prejudice requirement. *Lafler*, 566 U.S. at 163. "Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992).

This Court has reviewed Petitioner's PCR filings to more clearly understand the contours of his claim before that court. There, Petitioner provided the following facts:

> Petitioner submits that trial counsel was ineffective in failing to properly explain the possible sentences the petitioner was facing and therefore failed to properly advise him of his all of his option [sic]. (PA-19, aa). The petitioner contends that trial counsel advised the petitioner that he was looking at life over thirty years if spared the death penalty. However, petitioner now understands that this is not true. Petitioner's exposure due to being charged with two homicides was two separate sentences, and in fact, two consecutive sentences of life over thirty years. However, this sentence exposure was not properly explained to the petitioner, and had petitioner realized what the possible exposure would be, he may have chosen a different path. Trial counsel's conveyance of this wrong and/or misleading information limited the petitioner's ability to make choices on how to proceed at trial, thereby causing him significant prejudice, and possible altering the outcome of his trial.

(ECF No. 19-18 at 54-55).

The PCR Court denied an evidentiary hearing on this particular claim, ruling from the bench as follows:

> In the first instance, regardless of any expression by Trial Counsel respecting the frequency with which verdicts of death were handed down by juries, the fact remains, the Defendant was fully aware that he was exposed to that death sentence if he chose to go to trial.
>
> If the exposure to a death sentence was not enough to cause the Defendant to consider the State's plea offer, it is unlikely that his awareness of the possibility of a lesser sentence would have done so.
>
> Even if the Court accepted the Defendant's assertions, the argument is without merit.  Throughout these proceedings, including this Petition, the Defendant has denied his guilt and proclaims his innocence.
>
> Under these circumstances, the Defendant suffered no prejudice even if Counsel had failed to provide accurate sentencing information to the Defendant.  As a matter of law, a defendant cannot commit perjury in giving a factual basis for a crime he did not commit.  *See State v. Taccetta*, 200 N.J. 183, (2009). Consequently, he would have been compelled to go to trial.
>
> The Defendant's arguments here have implications beyond this particular point.  The cavalier manner with which this Defendant regards the truth weighs heavily on the issue of the credibility of his assertions throughout the Petitioner.  Credibility assessments often rely upon the Court's observations of a witness, consistency or inconsistency of the testimony offered, its reasonableness or unreasonableness with regard to other evidence and other subjective criteria.  It is a rare case indeed where a declarant whose credibility is at issue will admit he has such a complete disregard for the truth that he would, under oath, commit perjury to secure an advantage for himself.

(ECF No. 19-90 at 17-18.)

Respondent submits that Petitioner's claim is without merit because Petitioner could not have possibly expected concurrent sentences for two murders.  (ECF No. 48 at 10.)  Moreover, Respondent argues that Petitioner asked the Court to issue a concurrent rather than consecutive

sentences at his sentencing hearing. (*Id.*) The Court is not swayed by either of Respondent's arguments. First, Petitioner's assumptions, however reasonable or unreasonable, of whether he would receive a concurrent or consecutive sentence is not a factor that this Court considers when assessing such a claim. Further, Petitioner's understanding of his sentence exposure on the day of his sentencing hearing does not factor into this Court's analysis of his understanding at the time that he may have rejected any plea offers. Petitioner may have furthered his understanding of his sentencing exposure after being found guilty and having the time to further consult with counsel in the days and weeks leading up to his sentencing.

Nonetheless, this Court finds that Petitioner has not demonstrated that the state court decision was unreasonable. *Matteo v. Superintendent*, 171 F.3d 877, 891 (3d Cir. 1999) ("[F]ederal habeas court must ask whether the state court decision represented an 'unreasonable application' of Supreme Court precedent: that is, whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified."). The facts before the state PCR Court were minimal. In the instant petition, Petitioner provides further factual detail about his trial counsel's supposed inaccurate plea bargain advice. Nonetheless, the facts before the state court do not demonstrate how Petitioner was prejudiced by trial counsel's advice and therefore its application of clearly established federal law was not unreasonable. Petitioner understood that he was charged with a death penalty eligible offense, notwithstanding counsel's purported representation of the unlikelihood of receiving such a sentence. Petitioner was ultimately not sentenced to death and received life sentences instead. To the extent that Petitioner now asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, appellate counsel cannot be deemed ineffective for failing to raise an issue that would

61

not have resulted in the reversal of his client's sentencing.  *See Buehl,* 166 F.3d at 174.  Accordingly, this claim will be denied.

Petitioner makes four additional claims challenging trial counsel's effectiveness during the jury selection process.  First, that trial counsel failed to object to jurors who had personal relationships with state witnesses; second, that trial counsel failed to include Petitioner in sidebar conferences during jury selection; third, that trial counsel used a prejudicial jury questionnaire; and fourth, that trial counsel failed to move for mistrial when a juror conveyed a deliberations-related question to a court officer rather than directly to the court.

The Sixth Amendment right to a jury trial guarantees a criminal defendant the right to a "fair trial by a panel of impartial, indifferent jurors," *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted), and that right is extended to state criminal trials through the Due Process Clause of the Fourteenth Amendment.  *Duncan v. Louisiana*, 391 U.S. 145, 148–49 (1968). "An impartial jury consists of nothing more than jurors who will conscientiously apply the law and find the facts." *Lockhart v. McCree*, 476 U.S. 162, 163 (1986); *see also United States v. Tindal*, 357 F. App'x 436, 438 (3d Cir. 2009) (explaining that "[j]urors are presumed to be impartial").

10. Counsel's Infectiveness for Failing to Object to Jurors Who Had Personal Relationships with State Witnesses.

Petitioner argues that his trial counsel's failure to object to, or, in the alternative, to use peremptory strikes to eliminate three jurors with ties to state witnesses and law enforcement, respectively, constituted ineffective assistance.  (ECF No. 6-6 at 8-9.)  Petitioner argues that he "complained in vain when counsel failed to request to excuse these jurors for cause, at voir dire, and subsequently, failed to excuse them by preemptory challenges."  (ECF No. 6-6 at 9.) Respondents submit that Petitioner has not provided anything but bald assertions to support this

claim.  (ECF No. 48 at 7.)  The Appellate Division denied Petitioner's claim, briefly adding that "[t]he jury voir dire was also handled properly."  *See Maqbool*, 2013 WL 57683 at *8.   Petitioner now submits that appellate counsel was equally ineffective for failing to raise this claim on appeal. (ECF No. 6-7 at 25.)

During Petitioner's trial jury selection, two prospective jurors, P.B.[8] and D.M. (ECF No. 52-32 at 19), indicated that they were long-time acquaintances of state witness, Detective Calvin Hart.  Additionally, prospective juror G.T. indicated that her brother worked at the Hudson County Correctional Facility, where Petitioner was housed during the course of his pre-trial and trial proceedings.  Petitioner submits that since his trial, he learned that juror D.M.'s son was a fellow inmate at the Hudson County Correctional Facility with whom Petitioner had a contentious relationship with as a result of D.M's son's gang affiliation.  (ECF No. 6-6 at 9.)  Petitioner further submits that juror G.T.'s brother regularly interacted with Petitioner during the course of his trial, as part of his duties, which included conducting strip searches on Petitioner upon his return to the correctional facility.  (*Id.*)  Each of these jurors and the respective issues associated with each is considered in turn.

The record reflects that the trial court made the following inquiry after reading P.B.'s juror questionnaire:

> THE COURT:  Sir, in discussing the answers you provided on your questionnaire with Counsel, they've advised me that you indicate on the questionnaire that you are familiar with one of the potential witnesses in the case, Calvin Hart?
> P.B.:  Yes.  I went to school with him, and I do see him sporadically at the school that I volunteer.  He comes in and lectures the children on safety and various other related matters that he had.
> THE COURT:   Now, do you think, sir, that your personal relationship or personal knowledge of Calvin Hart would affect your ability to evaluate his credibility if he were called as a witness?

---

[8] This Court will identify the jurors by their initials to maintain their privacy.

> P.B.:  No, sir.
> THE COURT:  You don't think even though you had this almost
> near lifetime association with him, it would impact upon you?
> P.B.:  Never has, sir.  We have had disagreements in the past and I
> am sure we will.

(ECF No. 52-42 at 40-41.)

The record reflects that the parties made the following inquiry after reading D.M.'s

questionnaire:

> MR. ROZZI:  Then I also saw you know Detective Calvin Hart?
> D.M.:  Only because he's my cousin's friend.
> MR. ROZZI:  It wasn't from work that you know him?
> D.M.:  No.
> MR. ROZZI:  Have you spoken to Calvin Hart about his job?
> D.M.:  I haven't seen him.
> MR. ROZZI:  In a long time.  If Detective Hart were to testify in this
> case, would you be able to judge him by the same standard as any
> other witness?
> D.M.:  Sure.

(ECF No. 52-32 at 19.)

Finally, the record reflects that the parties made the following inquiry after reviewing

G.T.'s questionnaire:

> MS. DI NARDO:  Your brother, I notice from your questionnaire
> your brother is a corrections officer.
> G.T.:  He's a corrections officer.
> MS. DI NARDO:  And where is that, in Kearny?
> G.T.:  In Kearny, I don't know where, it's in Kearny.
> MS. DI NARDO:  How Long has he been a Hudson County
> Corrections Officer?
> G.T.:  Probably for 20 something years.
> MS. DI NARDO:  Do you see him much?
> G.T.:  No.
> MS. DI NARDO:  Do you have occasion to talk to him about his
> job, about his work?
> G.T.:  No, not really.
> MS. DI NARDO:  How often would you say that you see him?
> G.T.:  The past year, once.
> MS. DI NARDO:  So is it fair to say that you haven't talked to him
> about the death penalty- -

> G.T.:  No.
> MS. DI NARDO:  -- Or about what his workload is, or the things he does at the jail?
> G.T.:  No, no, we don't discuss that.
> MS. DI NARDO:  So you see him once a year?
> G.T.:  Actually, I saw him at my niece's birthday party in January, and we never discuss work.
> MS. DI NARDO:  So  mostly family gatherings is where you would run into him?
> G.T.: Yes.

(ECF No. 52-58 at 22-23.)

As the Third Circuit has observed:

> The Sixth Amendment guarantees every criminal defendant "the right to a ... trial[ ] by an impartial jury." U.S. Const. amend. VI. Complementing this right are the protections afforded by the Due Process Clause, which have "long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Voir dire examination serves to protect the right to an impartial jury by providing the parties a means of uncovering juror bias. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143–44, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Morgan*, 504 U.S. at 729–30, 112 S.Ct. 2222; *Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). Bias that emerges in response to voir dire questioning can lead to excusal of a juror for cause or may facilitate the parties' intelligent exercise of peremptory strikes. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).
>
> Traditionally, courts have distinguished between two types of challenges for cause: those based on actual bias, and those based on implied bias. *E.g., Dennis v. United States,* 339 U.S. 162, 167–68, 70 S.Ct. 519, 94 L.Ed. 734 (1950); *United States v. Wood,* 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936); *United States v. Mitchell,* 568 F.3d 1147, 1151 (9th Cir.2009); *United States v. Torres,* 128 F.3d 38, 43 (2d Cir.1997). Actual bias, also known as bias in fact, is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Torres,* 128 F.3d at 43. All members of the venire are subject to examination for actual bias, which may become apparent when a venireperson admits partiality or may be inferred from responses to

voir dire questioning. *Wood,* 299 U.S. at 133–34, 57 S.Ct. 177; *Torres,* 128 F.3d at 43. District courts possess broad discretion in excusing prospective jurors for cause on the basis of actual bias. *Dennis,* 339 U.S. at 168, 70 S.Ct. 519. We defer to rulings of the district court on actual bias because it possesses a superior capacity to observe the demeanor of prospective jurors and to assess their credibility. *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Torres,* 128 F.3d at 44.

Implied bias, by contrast, is "bias conclusively presumed as [a] matter of law," or, put another way, "bias attributable in law to the prospective juror regardless of actual partiality." *Wood,* 299 U.S. at 133, 134, 57 S.Ct. 177. This doctrine is rooted in the recognition that certain narrowly-drawn classes of jurors are highly unlikely, on average, to be able to render impartial jury service despite their assurances to the contrary. *E.g., Dennis,* 339 U.S. at 175, 70 S.Ct. 519 (Frankfurter, J., dissenting); *Person v. Miller,* 854 F.2d 656, 664 (4th Cir.1988). for example, the victim of a crime might insist that she can serve as an impartial juror in her assailant's trial. But, understanding that the average person in her situation likely would harbor prejudice, consciously or unconsciously, the law imputes bias to her categorically and mandates her excusal for cause. *Smith v. Phillips,* 455 U.S. 209, 222, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring); *United States v. Greer,* 285 F.3d 158, 172 (2d Cir.2002).

*United States v. Mitchell*, 690 F.3d 137, 141-42 (3d Cir. 2012).

Here, Petitioner's argument appears to be that the three jurors in question had an implied bias that necessitated that they be excluded from the jury. The record reflects that both P.B. and D.M. informed the trial court that they could be impartial. Contrary to Petitioner's assertion that P.B. had an "intimate relationship" with Detective Hart, P.B. stated that despite their being longtime acquaintances, P.B.'s interaction with Detective Hart was merely at school events. Additionally, G.T., whose brother was not a witness in this matter, appeared to have minimal interaction with her brother. Petitioner does not provide when he learned that G.T.'s brother was one of the corrections officers with whom he regularly interacted with, and G.T.'s colloquy with the Court does not reflect that she was aware of this fact. The Third Circuit has repeatedly declined

66

to extend implied bias to relationships between jurors and government witnesses.  *See Mitchell*, 690 F.3d at 149.  This Court's review of the jury voir dire indicates that the court and the attorneys adequately inquired about these three individuals' ability to serve as impartial jurors in Petitioner's trial.  In other words, in light of the jurors' responses, follow-up was appropriate if not necessary.  On follow-up, however, no juror responded in a manner that would necessitate a for-cause finding.

Petitioner has not demonstrated how counsel's performance triggers either of the *Strickland* prongs.  As Respondent points out, the record reflects that Petitioner was aware that D.M.'s son was at the Hudson County Correctional Facility because that information was elicited during voir dire.  (ECF No. 48 at 36.)  Furthermore, Petitioner's trial counsel cannot be deemed ineffective for failing to address the issue of D.M.'s son being an inmate at the Hudson County Correctional Facility with whom Petitioner may have had a contentious relationship with, as Petitioner admits himself that he was not aware of this until *after* his trial.  Therefore, the Appellate Division's application of clearly established federal law was not unreasonable.  To the extent that Petitioner now asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction.  *See Buehl,* 166 F.3d at 174.  Accordingly, this claim will be denied.

11. Counsel's Infectiveness for  Failure to Include Petitioner from Sidebar
    Conferences During Jury Selection.

Petitioner's next argues that his counsel's failure to object to his exclusion from sidebar conferences during jury selection violated his constitutional right to be present at all stages of his trial.  Because this claim appears to be unexhausted, this Court will review the claim on the merits *de novo*.  Furthermore, Petitioner now submits also that appellate counsel was equally ineffective for failing to raise this claim on appeal.  (ECF No. 6-7 at 25.)

Petitioner claims that trial counsel's failure to include him in the sidebar conferences during jury selection constituted ineffective assistance. (ECF No. 6-6 at 11.) Respondents argue that Petitioner has not demonstrated how he was not allowed to participate in his own trial by virtue of not being included in the sidebar conferences. (ECF No. 48 at 12.) They further submit that Petitioner had the benefit of two attorneys at trial as well as a jury expert retained by counsel. (*Id.*)

> An attorney's obligation to consult with his client does not require counsel to obtain the defendant's consent to every tactical decision. *Florida v. Nixon*, 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (quoting *Taylor v. Illinois*, 484 U.S. 400, 417–18, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)). As with the choice to proceed before a magistrate judge during voir dire, the decision to have a criminal defendant present—and in close proximity to individual jurors—during individual voir dire conducted at sidebar is tactical and does not require the defendant's express consent.

*United States v. Johnson*, 677 F.3d 138, 141 (3d Cir. 2012) (internal quotation marks omitted).

Here, Petitioner submits that counsel informed him that the trial court prohibited defendants from being present during sidebar conferences. (ECF No. 6-6 at 10.) Petitioner argues that this restriction as well as the unavailability of technology for the Petitioner to listen to the conferences from the defense table restricted him from objecting to aspects of the jury selection process. (*Id.* at 11.) The record does not reflect that Petitioner objected to the trial court's prohibition on a defendant's presence at sidebar and Petitioner does not submit that he did in fact object. *See State v. W.A.*, 875 A.2d 882, 886-87 (N.J. 2005); *see also Williams v. Ricci*,[9] Civil Action No. 09-1822, 2012 WL 6554371 *13 (D.N.J. Dec. 14, 2012) ("Petitioner's invariable three-days silence resulted in an implied waiver."). Petitioner has not raised a meritorious claim of

---

[9] The petitioner in *Williams v. Ricci*, Civil Action No. 09-1822, 2012 WL 6554371 *3-4 (D.N.J. Dec. 14, 2012), who was also on trial for murder, was prohibited from attending *in camera* conferences in the judge's chambers with individuals in the jury venire because of security concerns.

ineffective assistance of trial counsel.  His attorneys' decision to proceed with the voir dire while Petitioner, who was on trial for double homicide, maintained a distance from potential jurors was within the ambit of strategic trial decisions afforded to counsel.  *See Johnson*, 677 F.3d at 141.  To the extent that Petitioner asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction.  *See Buehl*, 166 F.3d at 174. Accordingly, this claim will be denied.

12. Counsel's Infectiveness for Using Prejudicial Jury Questionnaire

Petitioner next submits that his counsel's decision to include questions about his national origin, religion, and references to the September 11th attacks in a juror questionnaire constituted ineffective assistance.  (ECF No. 6-6 at 13-14.)  This claim appears to be unexhausted. However, this Court will reach the merits *de novo*.  *See Granberry*, 481 U.S. at 131 (The exhaustion requirement is not a jurisdictional requirement to the exercise of habeas corpus jurisdiction over the merits of a state prisoner's claims and a district court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim." )  Furthermore, Petitioner now submits that appellate counsel was equally ineffective for failing to raise this claim on appeal.  (ECF No. 6-7 at 25.)

The trial court utilized a juror questionnaire that was a modified version of the questionnaire in the court's "Capital Murder Manual" as well as a questionnaire previously used by another judge in a capital case.  (ECF No. 19-51 at 114.)  The trial court discussed amendments and recommendations to the questionnaire in a pre-trial hearing.  At that hearing, the trial court agreed to include, *inter alia*, the following questions:

> Would the fact that Tariq Maqbool is Pakistani in any way influence
> or affect your ability to serve as a juror on this case?  Yes or no.

69

> The Court also agreed to include as questions number 48, would the fact that Mr. Maqbool practices Islam in any way influence your perception of him as an individual, either positively or negatively? Please explain.  Provides a space for that explanation.
>
> Court has also agreed to include the following:  Would the fact that Terrorists who also practice an extreme form of Islamic fundamentalism are at was with the United States, in any way affect your ability to be fair or impartial to this Defendant?

(*Id.* at 116-17.)

The next day, the following colloquy occurred:

> THE COURT:  As I also understand it, ma'am, based on our conversation in Chambers, the modified questionnaire with subsequent modifications were made yesterday afternoon was provided to your client?
> MS. DI NARDO:  It was your Honor.
> THE COURT:  He has not voiced an objection or made any suggestions beyond the psychiatric supplement?
> MS. DI NARDO:  No, your Honor.  He has not seen that as far as what was presented to him yesterday.  No.  He's presented no objections.
> THE COURT:  Nor has he had any suggestions?
> MS. DI NARDO:  No suggestions at this time, your Honor.
> THE COURT:  Okay.

(ECF No. 19-52 at 78-79.)

Petitioner now submits that trial counsel had no basis to ask these type of questions as his trial occurred almost four years after the September 11th attacks.  (ECF No. 6-6 at 13.)  He further argues that nothing about his appearance, including his attire nor his facial hair, signified any association with a particular religion or cultural background.  (*Id.*)  According to the Petitioner, the aforementioned questions highlighted an issue that would more likely would have gone unnoticed by the jury and subsequently prejudiced the outcome of the trial.  (*Id.* at 14.)  Respondents submit that the questions were relevant, especially in light of Hudson County New Jersey's proximity to New York City, one of the sites of the September 11th attacks.  (ECF No. 48

at 17-18.) Moreover, they submit that trial counsel was particularly cautious to avoid any disparate treatment against Petitioner as he had filed a civil lawsuit in Middlesex County Superior Court mere weeks before committing the double murders. In that lawsuit, he alleged that he was discriminated against by co-workers on the basis of his religion and its nexus to the September 11th attacks. (*Id.*)

This Court having reviewed the challenged jury questions as well as the record of the court's colloquy with Petitioner's trial counsel, cannot say that the questions rendered the trial fundamentally unfair. *See Mu'Min v. Virginia*, 500 U.S. 415, (1991) ("[O]ur own cases have stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias."). The fact that Petitioner's trial was almost four years after the September 11th attacks does not take away from the magnitude of the coverage of the attacks. Therefore, trial counsel's decision to include this line of questioning cannot be deemed ineffective. To the contrary, counsel could be said to have legitimate tactical reasons in fleshing out any potential bias during jury selection. To the extent that Petitioner asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. Accordingly, this claim will be denied.

13. Counsel's Infectiveness for Failure to Move for Mistrial

Next, the Court will address Petitioner's claim that trial counsel's failure to "request the trial court to question the jurors and delve into any possible bias Ms. D. might have had towards the petitioner," constituted ineffective assistance. (ECF No. 6-6 at 10.) The Appellate Division denied this claim along with other claims as bald assertions "insufficient to support a claim of

ineffective assistance." *Maqbool*, 2013 WL 57683 at *8.  Furthermore, Petitioner now submits

that appellate counsel was equally ineffective for failing to raise this claim on appeal.  (ECF No.

6-7 at 25.)

At the start of deliberations, a juror approached a court officer and asked a question, which

the officer immediately relayed to the Court:

> OFFICER PEREIRA:  Judge, one other thing, I'd rather err on the
> side of caution, one of the jurors asked, Miss D. asked do the lawyers
> and the defendant sit outside, I said they go about their business,
> sometimes they're in there, sometimes they're not, they both do
> whatever they have to do, and then she said do they hear us out there,
> and I said no, and I closed the inside door.

(ECF No. 19-74 at 7.)  Neither the Court nor the parties asked any follow up questions and the

parties were excused from the courtroom.  (*Id.*)

Petitioner submits that the juror's inquiry had "negative connotations, about the petitioner

and his attorneys."  (ECF No. 6-6 at 10.)  He further submits the following:

> It is unclear whether Ms. D.'s inquisition, and expressed concern,
> was on an individual basis or collective.  Nevertheless, it is
> explicitly evident from the record that Ms. D. approached Officer
> Pereira in the presence of other jurors.  Therefore, it is submitted
> that it is fair to assume that outside influences were the basis of Ms.
> D.'s inquisition and concerns.

(*Id.*)

Petitioner has not established how counsel's supposed failure to inquire about the juror's

question or to move for a mistrial may have resulted in biased jury deliberations.  *See Rushen v.

Spain*, 464 U.S. 114 (1983) (finding that juror's personal knowledge of unrelated information that

was elicited during trial testimony did not result in biased jury deliberations even if juror

subsequently disclosed this fact to fellow jurors as well as in an *ex parte* conversation with the trial

judge.)  Here, Petitioner has not established how the juror's question implied that she had any bias

towards the Petitioner or had, as Petitioner's puts it, a "negative connotation." The question was more about the realities of the deliberation process and could have been meant to gauge whether the jurors were free to engage in deliberations without the possibility of being heard by any of the parties involved. The Appellate Division's decision was not unreasonable in light of clearly established federal law. To the extent that Petitioner asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. Accordingly, this claim will be denied.

    14. Counsel's Infectiveness for Failing to Investigate and Present Additional
        Defense Witnesses.

    Petitioner next claims that trial counsel was ineffective for failing to present an adequate defense through proper investigation and presenting key defense witnesses. (ECF Nos. 9 at 57-60, 9-1 at 1-5, 6-6 at 4-6.) Petitioner argues that despite counsel listing several possible trial witnesses on the court's witness list at the start of trial, they did not present the testimony of the majority of these individuals. (ECF No. 9 at 58.) Petitioner names the following individuals as potential defense witnesses that counsel failed to present: Maqbool Hussein, Adeel "Eddie" Maqbool, Sara Malick, Theseen Syed, Kenny Chong, Sam Awad, Ali Zaidi, and Monica Malloy. (*Id.*) Petitioner initially raised this claim in his counseled and supplemental *pro se* PCR filings. (ECF No. 19-17 at 5, 8-9.) The PCR Court denied this claim as lacking merit. (ECF No. 19-90 at 18-21.) The Appellate Division then denied this claim. *See Maqbool*, 2013 WL 57683 at *7. Furthermore, Petitioner now also submits that appellate counsel was equally ineffective for failing to raise this claim on appeal. (ECF No. 6-7 at 25.)

    The Appellate Division briefly assessed the proffered testimony of Maqbool Hussesin, Adeel "Eddie" Maqbool and Sara Malick, before affirming the PCR Court's decision:

Defendant contends his trial counsel was ineffective because he failed "to pursue an exculpatory witness." In his PCR petition, defendant presented transcribed statements from his father, Hussein Maqbool; his brother, Adeel Maqbool; and a friend, Sara Mallick. His father and brother both stated defendant had been at their home in Parlin in the early morning hours of November 1, 2002. Defendant alleges that his counsel should have investigated these claims because they would have given him an alibi defense. We disagree.

Two of the three alleged alibi witnesses did not provide defendant with an alibi. In her statement, Mallick only stated that defendant may have gotten into a verbal altercation with a few men in his store earlier in the night of October 31, 2002. This was before the murders were committed. Defendant's brother stated he returned home between 2:30 a.m. and 3:00 a.m. on November 1, 2002 and saw defendant lying on the couch in the living room. This was after the murders occurred. Therefore, neither of these witnesses provided defendant with an alibi.

Defendant's father alleged he went to bed between 10:00 p.m. and 11:00 p.m. He then got up around 1:00 a.m. to say his prayers and saw defendant speaking to someone on the telephone in the living room. The problem with this account is that, if it were true, defendant would have been able to personally provide this information to his attorney in their preparation for trial. He never asserts that he did so. Instead, he alleges his father told counsel about this alibi, but counsel failed to follow up on it. However, defendant's father's statement contains no allegation that he ever informed defendant's counsel of this claim. Under these circumstances, Judge De Pascale properly found that "[c]ounsel cannot be faulted" for not investigating a claim defendant and his father kept to themselves until years after the trial.

Just as significantly, defendant had already provided the police with two conflicting accounts of his whereabouts on the night of the murders. He first claimed he was at a motel with his girlfriend. When confronted with evidence that disproved this story, defendant admitted he was at the scene. Even if defendant's father's claim had been made known to defense counsel, he would not have been ineffective if he declined to a raise a third, totally inconsistent account to the jury. Therefore, neither prong of the *Strickland* test was met.

*Maqbool*, 2013 WL 57683 at *7.

With respect to Petitioner's father, Maqbool Hussein, Petitioner argues that his testimony would have supported Petitioner's alibi. Petitioner claims that his father saw him in their Parlin, New Jersey home at 1:00 a.m. on November 1, 2002, around the same time that the murders were determined to have ended. However, as the Appellate Division noted, while Petitioner claims that his father provided this information to trial counsel, Maqbool Hussein's transcribed statement, that was submitted in support of the PCR petition, does not indicate the same. Petitioner notably does not provide that he ever personally notified his counsel of his alibi but rather that he expected for these witnesses to be called because they were on the defense's witness list. (ECF No. 9 at 2-3.)

As for Adeel Maqbool, the supposed alibi testimony that Petitioner proffers is not alibi testimony at all. Petitioner claims now, as he did before the state court, that his brother could have testified that he saw Petitioner at home on November 1, 2002, at around 2:30 p..m.[10] *Maqbool*, 2013 WL 57683 at *7. (ECF No. 9 at 59.) Petitioner also alleges that his brother, Adeel, could have testified that Petitioner attempted to speak to law enforcement prior to his arrest and would have also provided testimony that refuted Lieutenant Russo's testimony that Petitioner requested an attorney in his interrogation. (ECF No. 9 at 60.) Petitioner does not indicate how Adeel Maqbool was privy to this information other than from Petitioner's self-serving comments, particularly the claim that Petitioner requested an attorney.

Petitioner next argues that Sara Mallick, Sam Awad, Tehseen Syed, and Kenny Chong would have been able to undermine Mir's testimony about details such as Petitioner's honest motives when he entered into the business deal with the victims, as well as Mir's purported perjured testimony that he did not have a car or driver's license . (ECF No. 6-6 at 5-6).

---

[10] Petitioner also submits that his brother, Adeel Maqbool, saw him at their home at 2:30 a.m. (ECF No. 9-1 at 3.)

Additionally, Petitioner claims that Ali Zaidi could have established that Petitioner's additional cellular phone lines were not opened for the purpose of furthering the crime. (ECF Nos. 9 at 60, 9-1 at 1.) Petitioner alleges that Zaidi, who was the T-Mobile sales representative who opened the phone lines, would have undermined the argument that Petitioner opened these additional lines for nefarious reasons. (*Id.* at 9-1 at 1.) Finally, Petitioner claims that Monica Malloy could have bolstered Defense Witness Angela Williams's testimony that the man she saw leaving the second crime scene did not resemble the Petitioner. (*Id.*)

Petitioner has not put forth sufficient facts or arguments supporting how the aforementioned individuals' testimony would have changed the outcome of the trial. *See Palmer v. Hendricks*, 592 F.3d 386, 393 (3d Cir. 2010) ("[A] court should be reluctant to convene an evidentiary hearing to explore the claims of a petitioner whose pleadings are factually insufficient to suggest any entitlement to habeas relief."). Moreover, Petitioner's argument that counsel's failure to compel Monica Malloy's testimony was ineffective fails as well. According to defense witness Angela Williams, she was outside on a cigarette break conversing with her cousin, Malloy, when she observed men leaving the area of the discarded burned vehicle containing decedents' remains. Petitioner admits that Malloy's proffered testimony would only echo Williams's testimony, arguably rendering it cumulative. *Danner v. Cameron*, 564 F. App'x 681, 685 (3d Cir. 2014) ("We have previously recognized that a failure to present cumulative evidence does not render counsel's performance ineffective under *Strickland*.") (citation omitted).

Petitioner has not demonstrated how counsel's failure to procure this testimony was ineffective under either *Strickland* prong. Accordingly, the state court's summary denial of the foregoing claim as unmeritorious was not an unreasonable application of clearly established federal law. *See Cullen*, 563 U.S. at 217-18. To the extent that Petitioner now asserts an

ineffective assistance of appellate counsel claim for not raising this claim on appeal, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. Accordingly, this claim will be denied.

      15. Counsel's Infectiveness for Failure to Allow Petitioner to Exercise His Right to Testify

Petitioner next argues that his trial counsel urged him not to testify in his own defense despite his wish to do so. He further submits that counsel also urged his family members to convince him to waive his right to testify. (ECF No. 6-6 at 12.) The Appellate Division denied this claim as lacking merit. *See Maqbool*, 2013 WL 57683 at *8. Petitioner now also claims that appellate counsel failed to raise this claim on appeal. (ECF No. 6-7 at 25.)

Petitioner provides, *inter alia*, the following:

> Petitioner submits that a practicable defense of duress, existed. It is submitted that, counsel's actions in subverting petitioner's efforts to testify, in conjunction with counsel's failure to call defense witnesses, impeded the factfinders from hearing his side, and hence prejudice petitioner.

(ECF No. 6-6 at 12-13.)

This Court has also reviewed Petitioner's submissions to the PCR court, where he made an identical argument to demonstrate prejudice. (ECF No. 19-21 at 56-57.) Respondents argue that Petitioner voluntarily waived his right to testify after having discussed the matter with his counsel and being apprised of his right by the trial court judge. The record reflects that the following colloquy occurred:

> THE COURT: All right. Mr. Maqbool, your lawyer has advised me that there are not additional witnesses to call by way of defense. At this point, it's my obligation to discuss with you your right to testify or right to remain silent.

As you know, sir, you have the absolute right to remain silent. You are not required to do or say anything during this trial. However, you do have the right to testify, if you choose to do so. This is the only opportunity that you will get to do so in this part of the trial. Have you discussed your right to testify and your right to remain silent with your lawyer, sir?

THE DEFENDANT: Yes, sir, to a point.

THE COURT: Pardon me?

THE DEFENDANT: To a point. I would like to have a little more time before I make a decision.

THE COURT: I'll give you a few more moments, sir. I asked your lawyers to speak with you about it previous to this, and I assume they have. Ma'am, have you discussed this with your client?

MS DI NARDO: We have, your Honor, but Mr. Maqbool has a couple of other issues he'd like to address about his choice, and I'm sure if we have a few minutes we'll be able to get that resolved.

THE COURT: All right. Now, sir, let me make one thing very clear to you. The decision on whether or not you testify in this trial is yours, and yours alone. Your lawyers cannot instruct you that you may not testify, it is your decision to make. Do you understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: The lawyers give you advice. Whether you follow that advice or not is entirely up to you. Do you understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Now, should you choose not to testify, there is a standard instruction that the Court could give to the jury if you want it. You have the right to decide whether you want the change given dealing with your election not to testify.

Obviously, if you choose to testify the instruction wouldn't be given, but if you choose not to testify, then you have to decide whether or not you want the Court to give the jury an instruction relating to your decision. So that you do not do that in a vacuum, I've provided a copy of the charge to your lawyer, and I'm sure she or they have reviewed it with you. But just so the record is complete, I want to read it to you so know precisely what the charge states.

As you know, the defendant has elected not to testify at trial. It is his constitutional right to remain silent. You must not consider for any purpose or in any manner arriving at your verdict the fact that the defendant did not testify. That fact should not enter into your deliberations or discussions in any manner at any time. The defendant is entitled to have the jury consider all of the evidence presented at the trial. He's presumed to be innocent even if he chooses not to testify.

That is the instruction that I would give to the jury if you decide that you want me to give it. There are all different schools of thought on whether or not that's a good idea or a bad idea, and I'm sure your lawyers will cover them with you, but once again, you have to deal with there it is your decision. Your lawyers can advise you, but it is your decision. And in speaking with you next, I will ask you for your decision, not for your lawyer's. Do you understand that, sir?

THE DEFENDANT: Yes, sir.
THE COURT: All right. Ma'am, how much time do you need?
MS. DI NARDO: Give us ten minutes. We have to go out in the fish bowl, Judge.
THE COURT. Take a ten minute break.
(Recess.)
(After Recess.)
THE COURT: All right. Ma'am, have you had enough time to confer with your client?
MS. DI NARDO: Yes.
THE COURT: Mr. Maqbool, have you had enough time to confer with your lawyer?
THE DEFENDANT: Yes.
THE COURT: Have you made a decision with respect to whether you will or will not testify?
THE DEFENDANT: Yes, I have.
THE COURT: What's your decision?
THE DEFENDAT: I will not testify.
THE COURT: Have you also discussed with your lawyer the charge that I read to you?
THE DEFENDANT: Yes, sir I understand.
THE COURT: And you want me give it or not to?
THE DEFENDANT: Please.
THE COURT: You want me to give it?
THE DEFENDANT: Yes.
THE COURT: All right. I assume, then, you're ready to rest, ma'am?
MS. DI NARDO: Yes, Judge.

(ECF No. 19-71 at 33-37.)

A criminal defendant has a constitutional right to testify on his or her own behalf. *See generally Rock v. Arkansas*, 483 U.S. 44, 49–53 (1987). Indeed, the Supreme Court has observed that "the most important witness for the defense in many criminal cases is the defendant himself."

*Id.* at 52.  Defense counsel has a duty to inform a defendant of this right, but a defendant may nevertheless waive it so long as the decision to do so is "knowing and intelligent."  *United States v. Pennycooke*, 65 F.3d 9, 11-13 (3d Cir. 1995).  "'The *Strickland* standard is applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify'"; it does not create the sort of structural defect that warrants automatic reversal.  *See Palmer v. Hendricks*, 592 F.3d 386, 394, 398 (3d Cir. 2010) (citation omitted) (quoting *Matylinsky v. Budge*, 577 F.3d 1083, 1097 (9th Cir. 2009)).  Thus, to succeed on the claim that counsel's deficient representation violated his right to testify, Petitioner must show both deficient performance and resulting prejudice. *See Ruiz v. Superintendent Huntingdon SCI*, 672 F. App'x 207, 210 (3d Cir. 2016), *cert. denied sub nom. Ruiz v. Tice*, 137 S. Ct. 1122 (2017).

Petitioner has not indicated what his testimony would have entailed had he testified.  *See United States v. Falciglia*, 2010 WL 2408153 *5 (W.D. Pa. June 7, 2010) (internal quotation marks and citations omitted) ("[D]efendant must produce something more than a bare, unsubstantiated, thoroughly self-serving, and none too plausible statement that his lawyer (in violation of professional standards) forbade him to take the stand.")  Further, the court's colloquy with Petitioner demonstrates that Petitioner had an opportunity to inform the court that he wished to testify notwithstanding his counsel's purported recommendation otherwise.  *See United States v. Robles*, 814 F.Supp. 1233, 1243-44 (E.D. Pa. 1993) (finding that defendants' waiver of their right to testify was voluntary, citing to their in-court colloquy with the trial judge).  Indeed, the trial court directly informed Petitioner that it was his decision to make.  Finally, in light of Petitioner's failure to provide what the omitted testimony would have entailed, the weight of evidence against Petitioner, which included an eyewitness's testimony, tips the scales against Petitioner.  *See Ruiz*, 672 F. App'x at 210 (citing *Saranchak v. Secretary, Pa. Dep't of Corr.*, 802 F.3d 579, 599–600

(3d Cir. 2015) ("In determining whether counsel's failure to present potentially exculpatory evidence was prejudicial, a reviewing court cannot merely determine whether there was sufficient evidence for a conviction at the time of trial, but instead must weigh the evidence as a whole and consider the potential impact of the previously unpresented evidence."). Consequently, Petitioner has not demonstrated that counsel was ineffective. The Appellate Division's decision was not an unreasonable application of clearly established federal law. To the extent that Petitioner now asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. Accordingly, this claim will be denied.

16. Counsel's Infectiveness for Failure to Object to the Trial Court's Accomplice Liability Instruction and Subsequent Response to a Jury Question

Petitioner next argues that trial counsel's inadequate response to the trial court's accomplice liability jury instruction led to potential confusion amongst jurors about Jawad Mir's role in the crime. (ECF Nos. 9-1 at 20-24, 6-6 at 23-24.) The Appellate Division denied this claim to the extent that Petitioner raised the claim about trial counsel's failure to object to the trial court's inadequate response to the jury's question. *See Maqbool*, 2013 WL 57683 at *5. The court denied this ineffective assistance claim along with several other claims as bald assertions and also noted "there was nothing inappropriate about the judge's instructions to the jury." *Id.* at *8. Petitioner now further claims that appellate counsel failed to raise this claim on appeal. (ECF No. 6-7 at 25.)

Petitioner provides an uncorroborated assertion that Mir entered into an agreement with the prosecution. (ECF No. 9-1 at 23.) He further argues that trial counsel subsequently failed to object to the trial court's response to a jury question about Mir. During jury deliberations, the trial court received a note from the jury containing a question about Mir:

> First, the jury would like to know if Jawad Mir received a deal from the prosecutor.  My recollection of the testimony in the case is that there is no evidence indicating whether there was a deal or there wasn't a deal, it simply wasn't covered during the course of the trial.
>
> Now, obviously my recollection doesn't control yours.  If you like, we can read his entire testimony back to you and you could hear it yourself and examine the testimony yourself.  That's your option.  You have to decide whether you want to do that when you go back into the jury room.

(ECF No. 19-77 at 9.)

Petitioner submits that the jury's question reflects that the jury shared Petitioner's skepticism about Mir's credibility or potential bias.  (ECF No. 9-1 at 22.)  Petitioner argues that had the trial court informed the jury of Mir's cooperation with the government, then the jury could have considered that information when applying the accomplice liability instruction.  (*Id.* at 23.) Petitioner argues that this particular question from the jury should have prompted trial counsel to ask for clarification from the judge.  (*Id.*)  With respect to trial counsel's reaction or lack thereof, to the jury's question about Mir, the question and the judge's answer did not require clarification. Petitioner cannot show that he was prejudiced by his counsel's failure to ask for a clarifying instruction that includes facts that were not in evidence.

It appears that the trial judge provided a thorough and proper jury instruction.  (ECF No. 19-75 at 68-88.)  The Third Circuit has articulated that when jury instructions are challenged, the Court will "consider the totality of the instructions and not a particular sentence or paragraph in isolation."  *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995).  The central issue is "whether viewed in light of the evidence, the charge as a whole fairly and adequately submits the issues in the case to the jury."  *United States v. Zehrbach*, 47 F.3d 1252, 1264 (3d Cir. 1995) (internal quotation marks omitted).

Contrary to Petitioner's claim, the record reflects that trial counsel objected to the accomplice liability instruction immediately after the trial judge provided that instruction. (ECF No. 19-75 at 94-97.) Trial counsel objected to the court's using an actual charged offense as an example that it provided to the jury. Counsel argued that "implicit in that is that it was the defendant that did it, and those actions caused the death. But it's really two things." (*Id.* at 94.) Trial counsel asked the court to rephrase the instruction examples so that instead of using a charged offense such as murder, the court would just use the word "act." (*Id.* at 94-95.) Counsel also asked the trial court to emphasize the causation requirements of all of the elements. (*Id.* at 97.)[11]

Petitioner does not specify what exactly trial counsel should have objected to with respect to the accomplice liability instructions. Moreover, Petitioner seems to conflate the jury's question about whether Mir obtained a "deal" from the prosecution with the accomplice liability instruction. Finally, Petitioner's argument totally negates the fact that multiple actors were involved in the crime, and nothing about the trial court's accomplice liability jury instruction suggested the liability of one actor over another.

Petitioner has not identified an erroneous jury instruction for trial counsel to have raised an objection. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("[t]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.") Moreover, Petitioner has not established a nexus between the allegedly erroneous instruction and the jury's question. The state court's denial of Petitioner's ineffectiveness claim was not an unreasonable application of clearly established federal law. As for the unexhausted portion of this claim, Petitioner has failed to establish a viable constitutional

---

[11] In the instant petition, Petitioner does not raise the exact issue raised by trial counsel regarding the accomplice liability jury instruction.

claim as a result of the accomplice liability instructions that were provided to the jury. To the extent that Petitioner now asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. Accordingly, this claim will be denied.

17. Counsel's Ineffectiveness for Failure to Request Certain Jury Instructions

Petitioner argues that state witnesses Jawad "Jay" Mir, Rajesh "Nick" Goel, Lieutenant Russo, and Manish Dhar's inconsistent statements warranted a "false in one-false in all" jury instruction. (ECF No. 6-6 at 26.) The Appellate Division denied this claim as lacking merit. *See Maqbool*, 2013 WL 57683 at *8. Petitioner further claims now that appellate counsel failed to raise this claim on appeal. (ECF No. 6-7 at 25.)

As Petitioner explains in his submission, the trial court received a joint application to omit a jury charge regarding prior contradictory statements of witnesses. (ECF No. 6-6 at 26-27.) The relevant portion of the charge conference is as follows:

> THE COURT: First of which, for no particular reason but that it happens to be on the top of the pile of papers that I have, is the Counsels joint application to the Court that the Court not charge prior contradictory statements of witnesses. Ordinarily, that is a charge that I would expect to give in a case like this where there have been cross-examination of witnesses in the case and prior statements used. However, as it's been explained to me, *for tactical reasons*, the Defense does not wish the Court to give the charge and the State joins in that application. Is that correct, ma'am?
> MS. DI NARDO: I am sorry, your Honor. My clients was talking to me.
> MR. BEAM: That is correct. We had that discussion in Chambers and *it is a tactical decision* on the part of the Defense. Our thoughts being that your Honor's normal Charge to the jury concerning how to assess credibility of witnesses would encompass what we would be looking to do with regard to that Model Charge, and there are other aspects of the Model Charge which we don't want the Court to explain to the jury.

84

> MR. ROZZI:  I have the same reason essentially, for any prior inconsistent statement that would involve the State.
>
> THE COURT:  The Court, the parties are satisfied the Court's ordinary instruction on credibility is adequate.  I will not give the charge.  I'll honor Counsel's request.

(ECF No. 19-72 at 3-4.) (emphases added).

The trial court provided the "ordinary instruction on credibility" as it stated that it would

at the charge conference.  That charge provided as follows:

> Now, as the judges of the facts, you are to determine the credibility of the witnesses, and in determining whether a witness is worthy of belief, and therefore credible, you may take into consideration the appearance and demeanor of the witness, the manner in which he or she may have testified, the witness' interest in the outcome of the trial, if any, his or her means of obtaining knowledge of the facts, the witness' power of discernment, meaning their judgment or their understanding, his or her ability to reason, observe, recollect, relate, the possible bias, if any, in favor of the side for whom the witness testified, the extent to which, if at all, each witness is either corroborated or contradicted, supported or discredited by other evidence, whether the witness testified with an intent to deceive you, the reasonableness or unreasonableness of the testimony the witness has given, *whether the witness has made any inconsistent or contradictory statements*, and any and all other matters in the evidence which serve to support or discredit his or her testimony.
>
> Through this analysis as judges of the facts, you weigh the testimony of each witness, and then determine the weight to give to it.  Through that process you may accept all of it, a portion of it, or none of it.

(ECF No. 19-75 at 15-16.) (emphasis added).

The New Jersey Rules of Evidence provide for a witness to be impeached through evidence

of prior inconsistent statements.  The "false in one, false in all" jury charge provides as follows:

> If you believe that any witness or party willfully or knowingly testified falsely to any material facts in the case, with intent to deceive you, you may give such weight to his or her testimony as you may deem it is entitled.  You may believe some of it, or you may, in your discretion, disregard all of it.

Model Jury Charge (Criminal), False In One-False in All.

The "false in one-false in all" charge is not a required charge "but rather a presumable inference that a jury [or judge sitting without a jury] may or may not draw when convinced that an attempt has been made to mislead them by a witness in some material respect." *See State v. Barthelus,* A-5012-10T2, 2013 WL 5575897, *7 (N.J. Super. Ct. App. Div. Oct. 11, 2013) (citations omitted). Here, the record reflects that the trial court provided a jury instruction on assessing witness credibility which included instructions on how to assess inconsistent statements as well as how much weight, if any, to give to any witness's testimony. (ECF No. 19-75 at 15-16.) Trial Counsel provided that they were opting out of the "false in one-false in all" jury instruction for tactical reasons.

Whether counsel pursued a sound strategy by opting out of this jury instruction is inconsequential, as Petitioner has not demonstrated how he was prejudiced by the omission of the particular charge because the subject matter was effectively covered in the witness credibility instruction that was provided. *See State v. R.H.*, A-3699-12T4, 2015 WL 4471542 *5 (N.J. Super. Ct. App. Div. July 23, 2015 ("Even where false in one, false in all is not given, a juror is instructed to evaluate a witness's credibility in the same fashion. A juror may accept all, some, or none of a witness's testimony. The difference is that false in one refers to witnesses who testify "falsely ... with the intent to deceive you."). Further, the record reflects that counsel conducted a vigorous cross-examination of witness, Mir, which included delving into details he provided to detectives about his immigration status. (ECF No. 19-56 at 9-22.) Therefore, the Appellate Division's decision was not an unreasonable application of clearly established law. To the extent that Petitioner now asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, appellate counsel cannot be deemed ineffective for failing to raise an issue that would

not have resulted in the reversal of his client's conviction.  *See Buehl*, 166 F.3d at 174.

Accordingly, this ground for a writ of habeas corpus will be denied..

> 18. Counsel's Ineffectiveness for Failure to Request Lesser Included Offenses with
> Respect to  Muni Ahn's Murder

Petitioner next submits that his trial counsel was ineffective by failing to request the jury

receive an aggravated manslaughter charge with respect to Muni Ahn's murder.  (ECF No. 6-6 at

24-26.)  The Appellate Division denied this claim as lacking merit.  *See Maqbool*, 2013 WL 57683

at *8.  Furthermore, Petitioner now submits that appellate counsel was equally ineffective for

failing to raise this claim on appeal.  (ECF No. 6-7 at 25.)

Petitioner argues that the evidence adduced at trial could have reasonably resulted in an

aggravated manslaughter conviction rather than a murder conviction with respect to Muni Ahn.

(*Id.* at 25.)  Respondent replies that Petitioner's claim fails due to the overwhelming evidence that

supported a guilty conviction for the murder of Muni Ahn.  (ECF No. 48 at 28-29.)

The trial court provided the following charge for the murder of Ahn:

> That on or about the 1st day of November, 2002, in the City of Jersey
> City, the County of Hudson, and within the jurisdiction of the Court,
> the said Tariq Maqbool purposely or knowingly did cause the death
> of Muni Ahn, or purposely or knowingly did inflict serious bodily
> injury resulting in the death of Muni Ahn, contrary to the provisions
> of the law.
>
> Now, I've already explained murder to you, I'm going to run
> through it again a little more quickly.  A person is guilty of murder
> if he caused the victim's death, or serious bodily injury resulting in
> the victim's death.
>
> Two, the defendant did so purposely or knowingly.  No change, it's
> the same charge.
>
> First, that the defendant caused Muni Ahn's death, or serious bodily
> injury that then resulted in Muni Ahn's death.  And two, that the
> defendant did so purposely or knowingly.  I've already explained
> purposely and knowingly for you.  In the context of a murder case,

you need to know that a person acts purposely when it's the person's conscious objective to cause death, or serious bodily injury resulting in death.

Now, relative to Muni Ahn's death, there is some testimony from which you could infer that a weapon was used, and in connection with that a homicide or killing with a deadly weapon such as a handgun, in itself would permit you to draw an inference that the defendant's purpose was to take life or cause serious bodily injury resulting in death.

A deadly weapon is any firearm or other weapon, device, instrument, material, or substance which in the manner its used, or is intended to be used, is known to be capable of producing death or serious bodily injury. In your deliberations you may consider the weapon used, and the manner and circumstances of the killing, and if you're satisfied beyond a reasonable doubt that the defendant shot and killed Muni Ahn with a gun, you may draw an inference from the weapon used, that is, the gun, and from the manner and circumstances of the killing as to the defendant's purpose or not.

The other element that the State must prove beyond a reasonable doubt is that the defendant caused Muni Ahn's death, or serious bodily injury resulting in death. As I previously advised you, in order to convict the defendant of murder, the State must prove beyond a reasonable doubt that the defendant either purposely or knowingly caused the victim's death, or caused serious bodily injury resulting in death.

In that regard, serious bodily injury means bodily injury that creates a substantial risk of death. A substantial risk of death exists where it is highly probable that the injury will result in death. Now, I mentioned serious bodily injury to you in connection with second and third degree aggravated assaults. This is a different, more restricted definition. In this definition, when we use the term serious bodily injury, we're talking about the defendant either purposely or knowingly caused the victim's death, or serious bodily injury resulting in death. In connection with murder, serious bodily injury means bodily injury that creates a substantial risk of death, not just the loss or impairment of a bodily function, okay, so when you're considering murder, the terms serious bodily injury means bodily injury that creates a substantial risk of death, that a substantial risk of death exists here it's highly probable that the injury would result in death, not just a permanent loss of the function of a bodily member or organ. That definition of serious bodily injury applies to the aggravated assault, not to murder. Everybody got that?

> Whether the killing is committed purposely or knowingly causing death, or serious bodily injury resulting in death must be within the design or contemplation of the defendant, in order for you to find the defendant guilty of murder, the State must first establish beyond a reasonable doubt that the defendant caused Muni Ahn's death, or serious bodily injury resulting in death. He either purposely or knowingly, as I've defined those terms for you.

(ECF No. 19-75 at 89-93.)

The trial court then provided the elements of aggravated manslaughter with respect to victim John Ahn:

> In order for you to find the defendant guilty of aggravated manslaughter, the State is required to prove each of the following elements beyond a reasonable doubt.
>
> First, that the defendant caused John Ahn's death. And second, that the defendant did so recklessly. Now you're seeing another mental state, which I'm going to explain to you in a minute, but it differs from purposeful conduct and knowing conduct. This is reckless conduct we're talking about. Third, that the defendant did so under circumstances manifesting extreme indifference to the value of human life.
>
> One element that the State must prove beyond a reasonable doubt is that the defendant acted recklessly. A person who causes another's death does so recklessly when he is aware of, and consciously disregards, a substantial and unjustifiable risk that death will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the defendant's conduct and the circumstances known to the defendant, his disregard of that risk is a gross deviation from the standard of conduct that a reasonable person would follow in the same situation.

(ECF No. 19-75 at 40-41.)

Failure to request instructions on the lesser included offenses cannot render legal assistance constitutionally ineffective if the trial evidence could not provide Petitioner's trial counsel with a rational basis for the lesser included offense charge. Petitioner's trial "attorney cannot have been ineffective for failing to request an instruction that was [effectively] unavailable" in view of the

evidence presented.  *Carpenter v. Vaughn*, 296 F.3d 138, 153 (3d Cir. 2002).  The evidence at trial supported a murder conviction.  Particularly the testimony of an eyewitness, Mir,  who observed Petitioner strangle John Ahn. (ECF No. 19-55 at 35).  Mir then watched Petitioner proceed to retrieve a gun and threaten Mir to shoot Muni Ahn as Ahn laid tied up on the ground.  (*Id.* at 40.) Shortly thereafter, Petitioner joined Mir in a vehicle and forced Mir and another passenger to put their fingerprints on what appeared to be the same weapon.  (*Id.* at 44.)  Moreover, the medical examiner testified that Muni Ahn had wounds that were consistent with a track wound of a bullet.[12] Petitioner's argument that his co-defendants, the Reid brothers, were only found guilty of the lesser included charge in their trial is inconsequential.  The evidence at Petitioner's trial supported a murder conviction.   Therefore,  the Appellate Division's decision was not an unreasonable application of clearly established law.  To the extent that Petitioner now asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction.  *See Buehl*, 166 F.3d at 174.  Accordingly, this claim will be denied.

> 19. Counsel's Ineffectiveness for Failing to Obtain Petitioner's Cellular Phone
>     Records

Petitioner alleges that he was denied his Sixth Amendment right to counsel due to trial counsel's failure to adequately investigate the case, particularly the cellular phone "tower records" that could have corroborated Petitioner's alibi defense.  (ECF Nos. 9 at 24-30, 6-6 at 2.)  While this claim was litigated at Petitioner's PCR proceeding, it does not appear that it was raised before the Appellate Division.   This Court will therefore reach the merits of the claim *de novo*.

---

[12] Dr. Perez, a medical examiner, could not definitively testify as to the existence of bullet wounds in Muni Ahn's skull because both his as well as John Ahn's corpses had undergone extensive fire damage before they were recovered by law enforcement.  (ECF No. 19-58 at 54-55.)

Furthermore, Petitioner's claim that appellate counsel was equally ineffective for failing to raise this claim on appeal will also be analyzed.  (ECF No. 6-7 at 25-27.)

Petitioner stresses that the telephone records could have exonerated him because there was no "forensic evidence" tying him to the murders.  (ECF No. 9 at 25.)  Petitioner now claims, as he did in his PCR proceeding, that trial counsel failed to procure alibi evidence such as his cellular phone records which would have proven that Petitioner was approximately fifty miles away from the murder scene at the time of the murders.  (ECF Nos. 19-17 at 5, 19-18 at 45.)

At trial, the state presented the testimony of a Nextel Communications records custodian. (ECF No. 19-66 at 24-27.)  The custodian's testimony included records of outgoing calls from decedent John Ahn's cellular phone number and telephone number \*\*\*-\*\*\*-1459 that were made on the afternoon of the murders.  (*Id.* at 26-27.)  The records custodian was not able to verify the subscriber associated with the 1459 telephone number because it was not a number that Nextel Communications serviced.  (*Id.* at 29.)  State witness, Rajesh Goel, testified that Petitioner called him from the 1459 number two days before the murders.  (ECF No. 19-65 at 36-37.)  Also at trial, state witness, Manish Dhar, testified that he contacted Petitioner at telephone number 732-\*\*\*-8008. (ECF No. 19-67 at 17-18.)  Finally, a T-Mobile records custodian testified that 1459 number was one of several telephone numbers issued to subscriber Mahood Butt, that was identified as a "fraud account.  (ECF No. 19-68 at 6, 8-9.)  The custodian further testified that the account was only open from October 25, 2002, to November 7, 2002.  (*Id.*)

During the course of the PCR proceeding, Petitioner provided multiple certifications in support of his alibi from his father, brother, and  Sara Mallick.  (ECF No. 19-90 at 22.)  However, as the PCR Court pointed out, only Petitioner's father's proffer would potentially support Petitioner's claim that he was at home at the time of the murders.  (*Id.* at 22-23.)

Almost five years after Petitioner's trial, the PCR Court granted Petitioner's motion for telephone records for telephone numbers 732-***-5590 and 732-***-8008 for the period from October 30, 2002, to November 4, 2002. (ECF No. 19-16 at 1.) Petitioner's efforts were unsuccessful due to the telephone service provider did not store records beyond five-years. (ECF No. 19-90 at 5.)

When denying this claim, the PCR Court noted the following:

> As far as Counsel's failure to investigate the cell phone records for the telephone number (732) ***-8008 is concerned, there is not credible evidence before me which establishes the relevance of that telephone number. There is evidence before me which establishes that that phone number is registered to the Defendant's brother, not the Defendant. To afford any evidential significance to that phone number, and this argument, one would have to accept the proposition that the owner of a retail cell phone store could not afford his own cell phone.
>
> Here, even that would be insufficient insofar as direct evidence introduced during the trial specifically establish the Defendant did have a cell phone, albeit under a fraudulent account, with the number (848) ***-1459; and it was that cell phone that he was using. The Record also established that it was this number that the victim called twice on the day of the murders.
>
> The evidence of Defendant's access to and use of that cell phone was not simply billing records. Rather, a live witness testified that this Petitioner in his presence used that phone to call the witness to enable the witness to add that number to his phone's contact list to enable the witness to contact this Defendant subsequently, indicating an ongoing use of that same phone.
>
> The requirement that the Court view the evidence presented in the light most favorable to the Petitioner does not go so far as to require the Court to suspend reality and accept any proposition regardless of its absurdity and inconsistency with credible evidence. While an investigation of the cell records for the number (732) ***-8008 could possibly have established the phone's usage in the area of the Defendant's home at the time of the crime, there is no credible evidence that such a call was made by this Defendant. The only results possible, even accepting the Petitioner's brother's testimony,

would be to show a call on a phone registered to the Defendant's brother.

Counsel therefore did not fail to investigate any credible, relevant evidence in this regard.

Further, even if Counsel had amassed the evidence provided with his Petitioner, competent Counsel could not be faulted for failing to present it at trial.

This evidence, as with all evidence at trial, cannot be considered in isolation. Rather, competent counsel would have to consider how a jury would evaluate such evidence with respect to all the other evidence in the case.

Counsel was aware that the Defendant himself had previously given two accounts of his whereabouts at the time of the murder, both of which were proven to be fabrications.

If Counsel had presented yet a third version of events, that once again, he was not at the scene, relying upon the information provided in support of the Petition, then under those circumstances, there might actually be grounds upon which an ineffective argument could be supported.

\*\*\*

Given the overwhelming evidence of the Defendant's presence at the scene and of his guilt, and the flawed nature of this proffered alibi, there is no doubt that even if presented before the jury, the outcome of the trial would not have been effected.

(ECF No. 19-90 at 24-26, 29.)

Petitioner's trial theory was that the state's witnesses fabricated Petitioner's involvement in the crime to conceal their own role in the robbery of hundreds of thousands of dollars and murder. (ECF No. 19-53 at 53-66.) Trial counsel argued that in the absence of physical evidence linking Petitioner to the murder, the jury would determine that the state's "star witness" Jawad Mir falsely depicted himself as Petitioner's victim in order to exculpate himself from any wrongdoing. (*Id.* at 55-56.)

Petitioner has not met *Strickland's* prejudice prong in order to ultimately prevail on this claim. He has not shown a reasonable probability that but for his counsel's alleged errors, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This standard is more likely to be met by a verdict that is "only weakly supported by the record," as opposed to one with "overwhelming record support." *Id.* at 696. Here, the state's case against Petitioner included among other things, a motive and testimony from an eyewitness. As the PCR Court noted, Petitioner owned a cellular phone retail store and was observed to have had multiple telephone numbers associated with him. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless . . . counsel's failure to pursue those investigations may not later be challenged as unreasonable. *Id.* at 691. In addition, as the trial court noted, the phone number was registered to Petitioner's brother, not Petitioner. Moreover, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. Accordingly, this claim will be denied.

20. Counsel's Ineffectiveness for Failing to Obtain Exculpatory Recording from Petitioner's Phone and for Failing to Introduce Petitioner's Cellular and Business Telephone Records

Petitioner next alleges that he was deprived of his Sixth Amendment right to effective counsel due to trial counsel's failure to obtain an audio recording of state witness, Jawad Mir, implicating himself in the murders and pleading for the Petitioner's help. (ECF No. 9 at 30-33.) He further contends that counsel also failed to obtain his personal and business telephone records. Petitioner first raised this ineffectiveness claim in his *pro se* supplemental brief to the PCR Court. (ECF No. 19-17 at 8.) It appears that the Appellate Division only addressed the portion of this claim that pertains to the issue of counsel failing to investigate the cell phone recording. *See*

94

*Maqbool*, 2013 WL 57683 at *5, 8.  The latter portion of this claim regarding cellular and business telephone records appears to be unexhausted.  Therefore, this Court will address the latter portion of the claim *de novo* while affording AEDPA deference to the claim as it relates to counsel's failure to investigate a recording on his cell phone.  Furthermore, Petitioner now submits that appellate counsel was equally ineffective for failing to raise this claim on appeal.  (ECF No. 6-7 at 25-27.)

Petitioner argues that he implored his trial counsel to pursue the recording of a conversation with Jawad Mir that Petitioner recorded on his own cellular phone just days after the murders. (ECF No. 9 at 31.)  On the call, Mir could allegedly be heard seeking Petitioner's help and Petitioner advising him to "come clean and not to run away from authorities."  (*Id.*)  Moreover, Petitioner argues, "multiple state witnesses also confirmed the same in their statements to the police and, subsequently, at trial."  (*Id.* at 33.)  Respondents argue that Petitioner has not provided any evidence to support the existence of this recording and that the trial testimony does not support Petitioner's claim.  (ECF No. 19 at 62-63.)

The PCR Court reasoned: "With respect to the alleged cell phone conversation, the Defendant has not provided any evidence to substantiate either the existence or content of this call. His statements relative to this ground therefore constitute mere bald assertions."  (ECF No. 19-90 at 21.)  After reviewing the trial testimony, this Court has not found testimony from any trial witness to support Petitioner's claim.  The Appellate Division's determination was not contrary to clearly established federal law.  *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010) ([B]ald assertions and conclusory allegations do not afford sufficient ground for an evidentiary hearing." (citations omitted).

Additionally, Petitioner has not demonstrated how his counsel's failure to obtain his telephone records would have affected the trial outcome.  To the extent that Petitioner now asserts

an ineffective assistance of appellate counsel claim for not raising this claim on appeal, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. Accordingly, this claim will be denied.

> 21. Counsel's Ineffectiveness for Failure to Request DNA Testing and Finger Print Analysis

Petitioner next claims that his counsel was ineffective for not requesting DNA testing and finger print analysis of evidence. (ECF No. 6-6 at 20.) Petitioner argues that his trial counsel should have requested DNA and finger print analysis of the electrical cord that the state asserted was used to kill John Ahn; the plastic "light box" from which the cord was taken; and finally a plastic bag that contained money that purportedly belonged to Petitioner. (*Id.*) Petitioner further claims that appellate counsel failed to raise this claim on appeal. (ECF No. 6-7 at 25.) Because this claim is unexhausted, this Court will reach the merits *de novo*. Respondent counters that Petitioner's trial counsel attacked the state's failure to conduct DNA testing when it cross-examined the state's forensic expert, Thomas Lesniak. (ECF No. 48 at 22-23.)

The record reflects that the state's evidence included an eyewitness to John Ahn's strangulation. Petitioner's contention that such testing would have proven his innocence is speculative. He has not provided any information that had the DNA tests been conducted there is a reasonable probability that he would have been exonerated. Petitioner has not met his burden under *Strickland*. Moreover, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. Accordingly, Petitioner's request for habeas relief is denied on this claim.

22. Counsel's Ineffectiveness for Failure to Object to *Brady* Violation.

Petitioner next argues that trial counsel's failure to object to a purported *Brady* violation constituted ineffective assistance.  (ECF No. 6-6 at 20-21.)  He claims that the State "fail[ed] to provide documents related to his purported statements in a timely fashion; fail[ed] to provide Detective Charles Russo's original handwritten notes; and for failure to provide defense with a second report pertaining to petitioner's interview."  (*Id.*)  Petitioner further claims that appellate counsel failed to raise this claim on appeal.  (ECF No. 6-7 at 25.)  This claim appears to be unexhausted, therefore this Court will reach the merits *de novo*.  Respondents provide that Petitioner has not articulated a valid *Brady* claim because the purportedly withheld documents were provided to the defense.  (ECF No. 48 at 24-26.)

Allegations involving *Brady v. Maryland*, 373 U.S. 83 (1963), are analyzed as a type of prosecutorial misconduct, which claim requires certain elements be met.  *See Banks v. Dretke*, 540 U.S. 668, 671 (2004).  In this regard, a petitioner "must show that: (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material." *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004) (citations omitted).  "[E]vidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).

Courts that have addressed the issue of whether delayed disclosure of inculpatory evidence violates a Petitioner's constitutional rights, have required that the defendant establish the prejudicial effect of the late disclosure:

> Late disclosure of inculpatory statements may, in certain circumstances interfere with a defendant's right to a fair trial, since substantial prejudice may result if counsel does not have adequate time to attempt to overcome the prejudicial effect of such evidence.

> In such a case, it is the responsibility of defense counsel to bring the matter of potential prejudice to the attention of the court prior to trial and either request a continuance or move the court for a ruling excluding the objectionable testimony on due process grounds. Such a procedure will afford the defendant the opportunity for a full and fair hearing as to defendant's objections, and will allow the trial court to make an informed decision as to how best to deal with any prejudice the defendant might otherwise suffer.

*United States v. Espericueta Reyes*, 631 F.2d 616, 623 (9th Cir. 1980) (citation omitted); *see also United States v. McCloud*, 585 F. App'x 881, 888 (6th Cir. 2014) (holding that inculpatory evidence produced on the eve of trial was not *Brady* as it was not exculpatory and no prejudice ensued because the trial court granted a one-day continuance to review the evidence).

Petitioner has not demonstrated how he was prejudiced by the timing of the state's disclosure. *See United States v. Hill*, 659 F. App'x 707, 711 (3d Cir. 2016) (citing *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999) ("[T]he Supreme Court has rejected the contention that impeachment evidence does not qualify as *Brady* material merely because it is also inculpatory.)) In addition, Petitioner has not established that the prosecution withheld evidence. As Respondents point out, the record reflects that the trial judge's credibility finding at the suppression hearing, relied in part on the consistency of Lieutenant Russo's formal reports and notes with his testimony. (ECF No. 19-52 at 73.) Moreover, although Petitioner considers the state's disclosure untimely, the record reflects that they were available to the parties by the time of Petitioner's suppression hearing which was almost a month before the start of jury selection. Petitioner appears to be arguing that he had a right to the original copy of the handwritten notes. However, he has not articulated a basis for such a right.

In conclusion, Petitioner has not established that a federally protected right was violated because Lieutenant's Russo's case-related notes and reports appear to have been disclosed to the defense in a timely fashion. Petitioner has not demonstrated how he was prejudiced by counsel's

failure to raise a non-existent *Brady* issue.  To the extent that Petitioner now asserts an ineffective assistance of appellate counsel claim for not raising this claim on appeal, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction.  *See Buehl*, 166 F.3d at 174.  Accordingly, this claim will be denied.

     23. Counsel's Ineffectiveness for Failure to Request a *Wade* Hearing

     Petitioner next submits that his trial counsel's' failure to request a *Wade* hearing in advance of state witness Rajesh "Nick" Goel's in-court identification constituted ineffective assistance. (ECF No. 6-6 at 21-23.)  Furthermore, Petitioner now submits that appellate counsel was equally ineffective for failing to raise this claim on appeal.  (ECF No. 6-7 at 25.)  This claim appears to be unexhausted, therefore this Court will reach the merits *de novo*.

     A *Wade* hearing is a preliminary inquiry to determine the admissibility of an identification. *United States v. Wade*, 388 U.S. 218, (1967).     "An impermissibly suggestive identification procedure can occur in four settings:  a show-up, a photo array, a line-up and in court." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006).  The United States Supreme Court articulated the standard for impermissible suggestiveness in *Neil v. Biggers*, 409 U.S. 188, 196-97 (1972). There, the Supreme Court held that convictions based on eye-witness identification . . . will be set aside only if the photographic identification was so impermissibly suggestive as to give rise to a very substantial likelihood of . . . misidentification. *Id.*  The Court in *Biggers* also articulated that a "totality of the circumstances" included the witness's initial opportunity to view the suspect at the crime scene and degree of attention at that time, the witness's level of certainty in the disputed identification, the length of time between initial viewing and disputed identification, and the accuracy of any intervening description of the suspect occurring between those two events. *Id.* at 199-200.

The legal framework for analyzing the reliability of eyewitness identifications is the two-part *Manson/Madison* test. *See Manson v. Brathwaite*, 432 U.S. 98 (1997); *State v. Madison*, 536 A.2d 254 (N.J. 1988). The first step requires courts to determine whether the police identification procedures were impermissibly suggestive. *Madison*, 536 A.2d at 232. If the first prong is met, the court then weighs the five reliability factors to decide if the identification is admissible. *See Manson*, 432 U.S. at 114; *Madison*, 536 A.2d at 258-59.

Here, Respondent correctly notes that the record does not reflect any prior identification by Goel of the Petitioner. (ECF No. 48 at 27.) Goel testified at Petitioner's trial that the law enforcement agents he met with did not ask him to make a photographic or any other type of identification of Petitioner. (ECF No. 19-65 at 27.) Goel further testified that he and Petitioner met in a dimly lit office two days before the double murders. (*Id.* at 7.) Goel testified that he spoke to Petitioner about the proposed business transaction and that they exchanged telephone numbers. (*Id.* at 7-11.) Moreover, Petitioner's trial counsel deftly cross-examined Goel on his ability to observe the Petitioner and the level of certainty with which he identified Petitioner. (*Id.* at 27-33.) Finally, Petitioner claims that he advised his trial attorneys that Goel had an opportunity to observe Petitioner in the courtroom as Petitioner was being brought in the courtroom. (ECF No. 6-6 at 22.) Any encounter Goel and Petitioner had in the courtroom before the start of Goel's testimony is not a prior identification that warrants a *Wade* hearing. Consequently, Petitioner has not met either *Strickland* prong, as counsel had no basis to move for a *Wade* hearing in advance of Goel's testimony. Furthermore, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. *See Buehl*, 166 F.3d at 174. Accordingly, this claim will be denied.

C.    State Court Erred in Denying Relief Despite Petitioner's Purported Showing of Newly
      Discovered Evidence.

Petitioner submits that the state court erred by not granting an evidentiary hearing despite

his argument that newly discovered evidence warranted such relief.  (ECF No. 6-7 at 11-12.)

While Petitioner raised this claim before the PCR Court (ECF No. 19-18 at 86-88), and

subsequently before the Appellate Division in his appeal of the PCR denial, (ECF No. 19-33 at 17-

19), the record is unclear whether the Appellate Division considered this claim as it is not listed in

what appears to be an exhaustive list of claims raised before the court.  *See Maqbool*, 2013 WL

57683.  Nonetheless, Petitioner's claim fails under both *de novo* review and the AEDPA standard.

Petitioner submits that since his conviction, he learned that juror D.M. had a son who was

a fellow inmate at Hudson County Correctional Facility during the course of Petitioner's trial, with

whom Petitioner had an adversarial relationship.  (ECF No. 6-7 at 11-12.)  The record reflects that

the parties made the following inquiry after reading D.M.'s questionnaire:

> MS. DI NARDO:  Just one second, please?  I noticed from your
> questionnaire that, someone in your family had been charged with a
> crime or someone friend, family, you circles yes to the question.
> D.M.:  Huh-huh.
> MS. DI NARDO:  Who was that?
> D.M.: My son.
> MS. DI NARDO:  And what was the - -
> D.M.:  Drugs.
> MS. DI NARDO:  Where is your son now?
> D.M.:  In jail.
> MS. DI NARDO:  Is there anything about that case that could
> influence you or affect you in any way - -
> D.M.:  Not at all.
> MS. DI NARDO:  - - being a juror in this case?
> D.M.:  Not at all.
> MS. DI NARDO:  To your knowledge, was your son treated fairly
> by the Criminal Justice System?
> D.M.:  Yes.
> MS. DI NARDO:  Was your son prosecuted here in this County.
> D.M.:  Yes.
> MS. DI NARDO:  I don't have anything else, your Honor.

(ECF No. 52-32 at 25-26.)

The Sixth Amendment guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Actual bias against a defendant on a juror's part is sufficient to taint an entire trial. *See United States v. Allsup*, 566 F.2d 68, 71 (9th Cir.1977).  The U.S. Supreme Court has distinguished between external influences upon a jury, as in *Remmer*, and internal ones.  *See Tanner v. United States*, 483 U.S. 107, 117 (1987) (refusing to grant defendant's request for an evidentiary hearing on jurors' alleged use of alcohol and drugs during trial because a hearing would allow inquiry "into the internal processes of the jury").  The *Tanner* Court explained "the near-universal and firmly established common–law rule [that] flatly prohibit[s] the admission of juror testimony to impeach a jury verdict":

> Exceptions to the common–law rule were recognized only in situations in which an "extraneous influence" was alleged to have affected the jury. In situations that did not fall into this exception for external influence, however, the Court adhered to the common–law rule against admitting juror testimony to impeach a verdict. Lower courts used this external/internal distinction to identify those instances in which juror testimony impeaching a verdict would be admissible. Federal Rule of Evidence 606(b) is grounded in the common–law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences. [Rule 606(b)'s] legislative history support[s] [its] most reasonable reading—that jurors [may not testify] ... about 'outside influence[s]' to impeach their verdict."

*Tanner*, 483 U.S. at 117–24. *See also Suarez v. Mattingly*, 212 F. Supp.2d 350, 355 (D.N.J. 2002) ("The validity of a verdict may only be challenged where there is evidence of extraneous prejudicial information or an outside influence which may have affected the jury in its ability to render a verdict.)

Claims of this nature require that a petitioner establish that a juror failed to disclose a material fact during jury selection, *see McDonough Power Equip., Inv. v. Greenwood*, 464 U.S.

548, 556 (1984), and also to establish that the juror was in fact biased, *see Smith v. Phillips*, 455 U.S. 209, 215 (1982).  "Only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.  *See McDonough Power Equip.*, 464 U.S. at 556.

Petitioner argues that the juror's answers to the trial attorneys reflect her dishonesty because "she never mentions her sons's name, never mentions Hudson County Correctional Facility, and [spoke] in the past tense, clearly conveying that he son was already judged by the Criminal Justice System – i.e. that her son was in prison."  (ECF No. 51 at 56.)  Even if it were the case that D.M. did not volunteer which correctional facility her son was currently in, she indicated that he was in jail and that he was prosecuted in the same county where Petitioner's trial was being held.  Moreover, Petitioner has not established that D.M. was aware that her son and Petitioner had any knowledge of each other or contact with one another.  Petitioner's eventual discovery of D.M.'s son's identity does not assist this Court in determining whether D.M. had a bias at the time of Petitioner's trial.  Petitioner has failed to demonstrate that D.M. did in fact have external influences that could have jeopardized the integrity of Petitioner's conviction.  Therefore, Petitioner is denied relief with respect to this claim.

D.    Excessive Sentence Claim

Petitioner submits that he received an excessive sentence for the double murders.  (ECF No. 6-7 at 23-25.)  To the extent that Petitioner is arguing that his sentence was manifestly excessive, the state court rejected this claim on direct appeal.  *See Maqbool*, 2007 WL 1661133 at *13-16.  Petitioner did not articulate a valid constitutional claim in his direct appeal and this Court has no basis to disturb the state court's decision.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Based on the record, this Court finds that petitioner's sentence fell within the permissible statutory limit in effect at the time. The Court also finds the determining factors advanced by the sentencing judge in support of the extended term were sound and reasonable. (ECF No. 19-88 at 26-34). Moreover, even if this Court was of the opinion that the sentence was excessive, which is not the case, it is well established that "the severity of the defendant's sentence alone constitutes no ground for [habeas] relief." *United States ex rel. Jackson v. Myers*, 374 F.2d 707, 711 n. 11 (3d Cir.1967); *see also Townsend v. Burke*, 334 U.S. 736, 741 (1948).

To the extent that Petitioner is arguing that his sentence violates the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely v. Washington*, 542 U.S. 296 (2004), and *Alleyne v. United States*, 570 U.S. 99 (2013), the claim fails. Petitioner appears to be conflating the jury's decision not to apply aggravating factors that would warrant the death penalty with the judge's application of aggravating factors to determine a non-capital sentence.

The *Apprendi* rule ensures that "the judge's authority to sentence derives wholly from the jury's verdict." *See Blakely*, 542 U.S. at 306. However, the ruling in *Apprendi* applied to elements that increase statutory maximum sentences. *Id.* at 490. Here, the jury, consistent with New Jersey death penalty eligible cases, determined that the death penalty should not be imposed against Petitioner. *See Maqbool*, 2007 WL 1661133 at *1. Nonetheless, the jury found Petitioner guilty of two murders; therefore, Petitioner was subject to a life sentence. Petitioner's argument that the trial court increased his sentence based on an unlawful application of aggravating factors is without merit. A trial court may assess aggravating factors before determining a sentence. *See State v. Bieniek*, 986 A.2d 1251, 1255 (N.J. 2010) ("Under the Code, a sentencing court first must determine, pursuant to N.J.S.A. 2C:44–1(a) and (b), whether aggravating and mitigating factors

apply.  After balancing the factors, the trial court may impose a term within the permissible range for the offense.")

Petitioner also submits that this claim implicates the Supreme Court's procedural ruling in *Alleyne v. United States*, 570 U.S. 99 (2013).[13]  There, the Supreme Court ruled that any facts that raise the range of penalties to which a defendant is exposed are elements of the offense and must be found beyond a reasonable doubt.  *Id.* at 116.  More specifically, the *Alleyne* court distinguished its ruling from its earlier ruling in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), where it held that elements that raise the statutory maximum sentence must be submitted to a jury.  *Alleyne*'s ruling is not retroactively applied to Petitioner's case on collateral review.  *See United States v. Reyes*, 755 F.3d 210, 213 (3d Cir. 2014).

Petitioner also raises a double jeopardy claim for the first time in his traverse.[14]  (ECF No. 52 at 60.)  Petitioner argues that the trial judge's application of aggravating factors after the jury already determined that aggravating factors should not apply, implicates the constitutional prohibition on double jeopardy.  (*Id.*)

> The Double Jeopardy Clause of the Fifth Amendment provides that no person may "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This clause also applies to imprisonment and monetary penalties, *Ex parte Lange*, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1874), and it has been held to protect against "three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same

---

[13] Petitioner also argues that his sentence triggers the Supreme Court's ruling in *Apprendi*, 530 U.S. 466 (2000).  However, the ruling in *Apprendi* applied to elements that increase statutory maximum sentences and not mandatory minimum sentences.  *Id.* at 490.

[14] This Court notes that a "moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *D'Allessandro v. Bugler Tobacco Co.*, Civil Action No. 05–5051, 2007 WL 130798, at *2 (D.N.J. Jan. 12, 2007) (quoting *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir.1992)).  This Court nonetheless denies the claim on the merits.

> offense after conviction; and multiple punishments for the same
> offense." *Halper*, 490 U.S. at 440, 109 S.Ct. at 1897.

*United States v. $184,505.01 in U.S. Currency*, 72 F.3d 1160, 1165 (3d Cir. 1995).

Again, Petitioner insists that the trial court unlawfully considered aggravating factors. As noted, the jury's consideration of aggravating factors was to determine whether the death penalty should be imposed. The trial court's consideration of aggravating factors was to determine Petitioner's non-capital sentence. The record belies Petitioner's assertion that he was doubly punished for the same offense. The jury did not render any punishment, the trial court's sentence was the only one imposed. Petitioner has failed to raise a viable double jeopardy claim. Petitioner has equally failed to raise a viable argument with respect to any of his sentence related claims. Therefore, Petitioner's request for relief with respect to this claim is denied.

E.    Trial/PCR Judge's Bias Against Petitioner

Next, the Court addresses Petitioner's unexhausted claim that the trial/PCR judge displayed bias against him. (ECF No. 9-1 at 25-29.) Petitioner argues that Judge De Pascale's comments and rulings against the Petitioner at the pre-trial suppression hearing and the PCR hearing demonstrate his bias towards Petitioner. Petitioner submits that Judge De Pascale's credibility finding against Petitioner was emblematic of his bias all along. At the *Miranda* suppression hearing, the court heard conflicting accounts of the circumstances of Petitioner's arrest and his subsequent statement. Petitioner's account was contrary to Lieutenant Russo and Detective Wagner's testimony. At the close of the hearing, the court denied the motion to suppress the challenged statements, after it made several factual findings. "Now, I make those findings because I find Detective Russo's credibility to be superior to that of the Defendant's on this issue." (ECF 19-52 at 72.) That was the extent of the judge's comments about Petitioner's credibility. Petitioner also claims that the judge's bias was evident because of his "jesting" and "joking" with Lieutenant

106

Russo while he was on the stand.  (ECF No. 9-1 at 26.)  However, the suppression hearing record does not reflect any improper behavior or comments on the judge's part and Petitioner's uncorroborated claim about a bias in favor of Lieutenant Russo does not support his argument.

A review of the PCR record, as well, reveals no bias on the part of the judge.  Every comment that Petitioner's cites as evidence of bias are in fact, credibility findings with respect to the various claims that Petitioner raised.  By the time of the PCR hearing, Judge De Pascale was quite familiar with Petitioner's case as he presided over the pre-trial proceedings, trial and sentencing, five years prior.

"In order to demonstrate judicial misconduct for purposes of habeas relief, a petitioner must show actual bias and that he was treated unfairly by the trial judge.  *See Byard v. Hauck*, No. 07-5069, 2009 WL 114419 at \*14 (D.N.J., Jan. 15, 2009) (citations and quotations marks omitted).  "A mere allegation or the mere appearance of bias does not establish bias."  *Id.*  (citation omitted).  The Petitioner has not demonstrated that the judge was biased in any way.  As such Petitioner has failed to raise a viable constitutional claim and this claim is denied.

F.   Cumulative Error

Lastly, the Court will address Petitioner's claim that the cumulative errors deprived him of his constitutional rights.  (ECF No. 6-7 at 28-30.)  Petitioner previously only raised a cumulative error claim within the context of an ineffective assistance of counsel claim before the state court.  *See Maqbool*, 2013 WL 57683 at \*8.  Therefore, this Court will review the claim *de novo*.

Even if none of the claims on their own amounts to a constitutional violation, the "cumulative effect of the alleged errors may violate due process."  *United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir.1980); *see also Douglas v. Hendricks*, 236 F.Supp.2d 412, 436 (D.N.J. 2002) (Walls, J.) (no cumulative error when the trial was fair and verdict supported by

sufficient evidence); *Pursell v. Horn*, 187 F.Supp.2d 260, 374 (W.D.Pa. 2002) ("That the reliability of a state criminal trial can be substantially undermined by a series of events, none of which individually amounts to a constitutional violation, is an idea that has been accepted by nearly every federal court to have addressed the issue.").

This Court has determined that no errors occurred or that, to the extent errors did occur, they were not of a magnitude to warrant habeas relief. A review of the record reveals that any errors that may have occurred remain harmless when cumulated, and that the trial was fair and the verdict was supported by ample evidence. Accordingly, this ground for a writ of habeas corpus will be denied.

## VI.    CERTIFICATE OF APPEALABILITY

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter. *See* Third Circuit Local Appellate Rule 22.1. The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Based on the discussion in this Opinion, Petitioner has not made a substantial showing of denial of a constitutional right, and this Court will not issue a certificate of appealability.

## V.    CONCLUSION

For the reasons discussed above, Petitioner's habeas petition is denied.

An appropriate order follows.


Dated: June 24, 2019                          s/ John Michael Vazquez
                                              JOHN MICHAEL VAZQUEZ
                                              United States District Judge